## UNITED STATES STEEL CORPORATION, Plaintiff,

v.

## UNITED MINE WORKERS OF AMERICA et al., Defendants.

Civ. A. No. 76–998.

United States District Court,
W. D. Pennsylvania.

Aug. 6, 1976.

Billy M. Tennant, Phillip J. Sheehe, Pittsburgh, Pa., for plaintiff.

Lloyd F. Engle, Jr., Pittsburgh, Pa., for defendants.

## OPINION

JOHN L. MILLER, District Judge.

Pursuant to Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185, United States Steel (USS) seeks to preliminarily enjoin a work stoppage at its Robena Mine Complex [1] which is located in Greene County, Pennsylvania. The employees engaged in the work stoppage are members of defendant unions United Mine Workers of America (UMW), District No. 4 UMW and Local 6321 UMW. The matter in controversy was duly heard and the Court finds as follows:

The members of Local 6321 commenced this work stoppage by refusing to report for work on the midnight shift (12:01 A.M.), Monday, August 2, 1976. The work stop-

---

1. The complex consists of three separate mines (Robena Nos. 1, 2, and 3) and one coal preparation plant.

page has continued without interruption despite the fact that there have been no pickets at the Robena Mine Complex.[2] We find, however, that in order to put this cessation of work in proper context, a look at the preceding week's events is in order.

The week of July 26–31, 1976 brought uneasiness to the Robena Complex. Roving stranger pickets from West Virginia, evidently desiring to gather regional, if not national, support for their initial dispute with the Cedar Coal Company—which has now degenerated into a malicious attack upon the federal judiciary—were infesting the southwestern Pennsylvania coal fields. At various times during the week, usually before the midnight shift and under cover of darkness, these pickets would, in groups of 12 and 7 at times, present themselves in the proximity of Robena's mine portals. The evidence indicates that these sporadic visits resulted either in a refusal to work by members of Local 6321 or the communication of threats of physical bodily harm or personal property damage. If not explicit in their intentions the pickets certainly implied such threats and the Court has no reservation about concluding that at least some members of Local 6321 had been instilled with fear.

USS was aware of these pickets and requested cooperation from Local 6321's leadership to encourage the men to report for work. The leadership made gallant efforts throughout the week to that end and, although the atmosphere of tension pervaded the entire week, the men did work when the pickets were not present.[3] Because the pickets were not succeeding in completely shutting down Robena they sometimes accosted the members of Local 6321 who had

completed their shifts and conveyed the message that if they (the Robena miners) persisted in working merely because the pickets were not present for *every* shift change, they (the pickets) would deal with them accordingly.[4] On one night (12:01 A.M. shift, Thursday, July 29) the pickets actually went on USS's property (at the Preparation Plant) and, through use of the threat, had the men who apparently had reported for work prior to the pickets' arrival, leave their jobs.

Security at the entire Robena Complex consists of one or two guards who patrol the premises.

By week's end the employment situation at Robena had progressed to one of apprehension and unrest. Consequently a meeting was held by Local 6321 on Sunday, August 1 and the men, almost unanimously, voted to cease working until the West Virginia pickets were prevented from harassing them; in other words, these men wanted and still want the safety of their persons and their property guaranteed.

In conjunction with what has been related above the evidence is overwhelmingly uniform with regard to the most crucial factual question. This work stoppage in no way grew out of, or is related to, any dispute between USS and the employee-members of defendant unions. Our recollection of the testimony is that USS's witnesses completely agreed with the union's witnesses on this point. These men have not walked off the job because of any action or inaction taken by USS's management that is subject to the grievance procedure of the National Bituminous Coal Wage Agreement of 1974 (1974 Agreement).[5] On the contrary, we find the facts to support

---

2. Actually there was hearsay testimony intimating that roving pickets are still in the Robena Mine Complex area, however, none of the witnesses had direct knowledge of same.

3. Indeed, one miner, Arthur Bonessa, who is Vice President of Local 6321, testified that he worked all six days during the week of July 26. Mr. Bonessa, not surprisingly, worked the daylight shift (7:00 A.M.) and never encountered pickets *prior* to reporting for work. Likewise, Andrew McKenzie, Recording-Secretary of

Local 6321, testified that, having worked the afternoon shift (4:00 P.M.), his contact (twice) with the pickets was *after* he came out of the mine around midnight.

4. Since the United Mine Workers will not cross *any* picket line the West Virginia pickets were only successful when they appeared *before* the men reported for work on any given shift.

5. Plaintiff's Exhibit No. 1, Article XXIII.

the conclusion that these men truly want to work; however, they want to do so in an atmosphere free of fear that retributive action may be taken by a certain few who have been described as "mean, nasty, and irrational."

One other point should be noted in the factual context of this case. While the parties characterize this work stoppage as a "sympathy strike", that is, an overt display of unity demonstrating support for the primary cause being advanced in southern West Virginia, we believe the evidence indicates otherwise. None of the miners who testified could readily say what the West Virginia dispute was about except for what they read or heard through the news media. Moreover, the subject of what is troubling their West Virginia counterparts was not even discussed at the August 1 meeting at which the strike vote was taken. In fact their view of the primary dispute was one of indifference. Thus, while it is true that these miners did—and will—honor stranger picket lines, we find that such behavior derives from tradition and should not unequivocally be taken as a gesture supportive of a cause totally foreign and unrelated to their livelihood at Robena.[6]

## DISCUSSION

■ We start with the basic premise that federal courts are forbidden by Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, to issue injunctions against persons engaged in work stoppages. In *Boys Markets,*

*Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court created a narrow exception to § 4's blanket prohibition. This decision empowered a federal court to enjoin a labor strike so long as the underlying dispute which gives rise to the strike is subject to a mandatory grievance and arbitration procedure agreed upon by the employer and striking union. The key factor which enables an employer to come within the *Boys Markets* exception is that the work stoppage sought to be enjoined *must* be caused by a dispute that is capable of being submitted to the arbitral process.

■ We ascertain two possible reasons for the instant work stoppage, the designation of which is actually insignificant to the decision we make today. If, contrary to what we heard and believed, Local 6321 is engaged in a pure sympathy strike, then its conduct is completely shielded from federal injunctive relief by *Buffalo Forge Co. v. United Steelworkers,* —— U.S. ——, 96 S.Ct. 3141, 49 L.Ed.2d —— (1976). We do not believe that the apparent absence of a picket line at this ·time is a factor which justifies the assertion that *Buffalo Forge* is distinguishable and therefore not controlling here.[7] Nor do we believe that *Buffalo Forge* is distinguishable because the primary dispute in that case precipitated a legal strike while the one in West Virginia appears, from our limited knowledge of it, to be illegal. These differences are imma-

---

**6.** The argument could be made that, since the West Virginia dispute now concerns the repeated intervention of the federal judiciary in coal mine labor relations, the Robena miners certainly could identify with the position being taken by their southern brothers. This is because our district court is regularly summoned by coal producers to halt unlawful work stoppages within our jurisdiction. We find however that the miners who testified harbor no animosity with respect to this Court. If anything, the miners demonstrated respect for the authority of this Court.

**7.** While it is true that there was a picket line in *Buffalo Forge* we do not believe that the employees here need be confronted with a picket line for their refusal to work to be labelled a "sympathy strike." The Supreme Court specif-

ically noted in *Buffalo Forge, supra,* —— U.S. at ——, 96 S.Ct. at 3144:

After denying the temporary restraining order and finding that the P & M work stoppage was *not the result of the specific refusal to cross the O & T picket line,* the District Court concluded that the P & M employees were engaged in a sympathy action in support of the striking O & T employees. (Emphasis added.)

We read this language to imply that a picket line is not a necessary predicate to a sympathy strike. To our way of thinking a true sympathy walkout *should* be undertaken in the *conspicuous* absence of the primary pickets since the latter's very presence—the overt act of intimidation—breeds the antithesis of *esprit de corps.*

terial because the primary thrust of *Buffalo Forge* lies in the fact that the cause of the secondary work stoppage was not amenable to the arbitration provisions of the relevant labor contract (and one, incidentally, that contained an express no-strike clause). Since *Buffalo Forge* squarely addressed the question of whether a federal court may enjoin a sympathy strike—and answered it negatively—Local 6321's decision not to work cannot be disturbed by a district court injunction, if such strike is carried out in support of their union brethren.

■ If, as we believe, Local 6321 is refusing to work out of fear of reprisal their conduct is likewise protected but not necessarily because of *Buffalo Forge.* The uncontroverted fact in this case is that Local 6321 has no dispute with USS that is subject to mandatory arbitration under the 1974 Agreement. Without an arbitrable dispute being the reason for the strike USS cannot—regardless of how the other relevant facts are constructed—fit this case within the *narrow* exception of *Boys Markets. See Jones & Laughlin Steel Corp. v. United Mine Workers,* Civil Action No. 76–993 (W.D.Pa. August 3, 1976). That is the crux of this case pure and simple. The motion for a preliminary injunction must be denied.

Although we are constrained by law to deny the company's prayer for relief we feel equally compelled to comment on the alarming situation in which the parties before us now find themselves.

On the one hand we have a coal producer which needs production to feed its coke operations which in turn serve its ultimate function of manufacturing steel. Coal is vital to this employer. Cut off its supply for any length of time and you clot its lifeblood. The concern may not die but the harm is there and it is irreparable. Eventually USS, being integrated as it is, will feel the effects at various levels of its operations and, conceivably, many of its non-mining employees could be laid off. This is but one facet of what we consider to be an anomalous situation.

For on the other hand you have the unions, specifically the members of Local 6321 who are being deprived of earning a wage for themselves and their families. Upon reflection, are these coal miners really furthering *their* interests by staying off work? They have no dispute with the company; no reason to seek economic recourse against their employer; no legitimate purpose to be served by causing USS to feel financial discomfort. These miners are in fact, themselves, the recipients of pecuniary deprivation.

The irony of all of this is that, our hands being tied so to speak, we cannot grant the injunction to *help the unions* combat the dissident few who apparently are on the threshold of making a mockery of our time-tested system of laws.

It is simply incomprehensible to think that all of this (and more)[8] stems from a relatively small group of people who, having little regard for the law and probably less respect for their leadership, are engaged in a dispute that is not even remotely related to Local 6321 and USS.

This is indeed a sad time for many. It now appears that the days of eradicating labor strife through peaceful arbitration are close to extinction. There is in our midst a new breed of miners who are determined to fashion their own federal labor policy. Unfortunately for industry *and* labor, collective bargaining does not work when one party says "we do it my way or we don't do it at all." At this stage the courts can no longer provide solutions to the problems posed by the circumstances of this case. Under the current conditions legislative action may be *necessary*. In any event anarchy cannot be tolerated under our form of government.

How this debilitating situation can be corrected is an area of inquiry this Court shall not address. We do however call on

---

8. Reports are that work stoppages are spreading throughout Western Pennsylvania as well as other coal-producing states.

all concerned to begin serious thinking in that direction. In the final analysis it may well be that the remedy lies within the union itself: by union we mean the rank and file who are being used by a band of radicals to subvert our legal system as well as disrupt this country's economy. We cannot believe that the majority of idled mine workers sincerely believe that they are exercising good judgment. Few, if any, even know what precipitated the West Virginia controversy. Nor do we believe that the accusation made against the federal judiciary is a reason being accepted by the union members for stopping coal production. In our opinion a strenuous effort should emerge from within the union to curb the present practices that are plaguing the welfare of us all.

For the record it should be noted that this matter came on for hearing via USS's application for a temporary restraining order. At said hearing, held August 3, 1976, it was stipulated by counsel that the evidence taken be considered for purposes of a preliminary injunction.

Findings of fact and conclusions of law have not been separately stated but are included in the body of the foregoing opinion as specifically authorized by 52(a) of the Federal Rules of Civil Procedure.

An appropriate order shall be entered.

### ORDER

AND NOW, to-wit, this 6th day of August, 1976, it is hereby ORDERED that United States Steel's motion for a preliminary injunction be denied.