BITUMINOUS COAL OPERATORS'
ASSOCIATION, INC., a
corporation, Plaintiff,

v.

INTERNATIONAL UNION, UNITED
MINE WORKERS OF AMERICA, an
unincorporated association, Defendant.

Civ. A. No. 75–1168.

United States District Court,
W. D. Pennsylvania.

May 6, 1977.

See also, 431 F.Supp. 787.

Leonard L. Scheinholtz, Scott F. Zimmerman, Joseph F. McDonough, Reed Smith Shaw & McClay, Pittsburgh, Pa., Guy Farmer, William A. Gershuny, Farmer, Shibley, McGuinn & Flood, Washington, D.C., for plaintiff.

Harrison Combs, and Richard L. Trumka, Washington, D.C., Joseph A. Yablonski, Charles R. Both, Daniel B. Edelman, Washington, D.C., Melvin P. Stein, Kuhn, Engle, Blair & Stein, Pittsburgh, Pa., for defendant.

## OPINION

WEBER, District Judge.

The preamble to plaintiff's complaint shows that this labor lawsuit is an unusual one:

"The Complaint does not seek damages from the United Mine Workers of America. We ask only that the Court, pursuant to established legal principles, make findings and issue an order as prayed for herein *to strengthen the hand of the International Union by requiring it to take appropriate action to become a more effective and responsible party* to the National Bituminous Coal Wage Agreement, able to assure for its members the wages, benefits and rights of that Agreement, but also to assure that the Union and its

membership act responsibly toward the operators and live up to their reciprocal responsibilities under the Agreement. * * * The staggering losses to the industry, the coal miners, and the UMWA Pension and Health Funds financed by the industry are irreparable and cannot be recouped. Nor can the tonnage lost be replaced in a nation sorely in need of energy resources. * * * In sum, this suit is intended to create a climate conducive to long-range harmonious and stable labor relations in the coal industry. To this end, we seek a nation-wide order on the basis of the facts and the prayer for relief as set forth herein."

Defendant takes a less kindly view of the salutary motives for this lawsuit:

"The Complaint filed herein is unique not only in form but also in substance in that it requests relief which runs counter to basic, fundamental and virtually indisputable precepts of modern federal labor law. Plaintiff, the bargaining arm of management in the Bituminous coal industry, seeks through this action to interfere, and, indeed, to dictate control of the internal affairs of the United Mine Workers of America—the labor organization with which it is by law required to deal separately and at arm's length. By this action, management seeks to invalidate [the International's by-laws] and substitute for such provisions policies and procedures acceptable to Bituminous Coal Operators' Association, regardless of the policies contained in the UMWA International Constitution, the Constitutions of its various Districts, the provisions of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., the provisions of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 401 et seq., and the outstanding provisions of various court orders."

### Motion to Dismiss Complaint by International Union, UMWA.

This action is brought under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185, and Sections 2201 and 2202 of Title 28, U.S.C. Plaintiff seeks declaratory and injunctive relief. This suit is not directed at any one strike or work stoppage, but complains of a "national pattern and practice of picketing and work stoppages", over disputes which are subject to the grievance and arbitration provisions of the contract.

Bituminous Coal Operators' Association, Inc. (BCOA) is a nonprofit corporation incorporated under the laws of the District of Columbia and having its principal place of business in Washington, D. C. It is a voluntary association of bituminous coal mining companies whose employees are represented by the United Mine Workers of America (herein UMWA or International Union). Members of BCOA produce approximately 65% of all bituminous coal mined in the United States. BCOA is the sole and exclusive bargaining agent for its members and is the signatory on behalf of its members of the National Bituminous Coal Wage Agreement of 1974, the contract in issue here.

Defendant UMWA is an unincorporated labor organization, also having its principal offices in Washington, D. C. It represents its members, and its district and local union subdivisions, in negotiating collective bargaining agreements with plaintiff.

In December of 1974 the parties entered into a labor agreement, the National Bituminous Coal Wage Agreement of 1974 (the "1974 Agreement"). It became effective December 6, 1974, and continues in full force and effect until December 6, 1977.

The 1974 Agreement provides means for peaceful settlement of disputes through a multi-step grievance-arbitration procedure. Safety disputes, differences as to the meaning and application of contract provisions, differences as to matters not specifically mentioned in the contract, and any local trouble of any kind are all encompassed by the grievance-arbitration provisions. Article XXVII of the agreement [1] requires the parties to "maintain the integrity of the

---

1. Article XXVII of the 1974 Agreement provides:

The United Mine Workers of America and the Employers agree and affirm that, except as provided herein, they will maintain the integrity of this contract and that all disputes

contract" and provides that "all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the "Settlement of Disputes' Articles of this Agreement". Article XXVII exempts from its coverage disputes "national in character".

BCOA asserts that as a consequence of these contractual undertakings, UMWA is obliged to take timely steps to insure compliance by its members with the 1974 Agreement and to end illegal picketing and work stoppages by its members "by any and all reasonable means at its command".

Nevertheless, alleges BCOA, notwithstanding the provisions of the 1974 Agreement and identical provisions of predecessor labor agreements, "defendant's members have engaged in and continue to engage in a national pattern and practice of picketing and work stoppages over disputes which are subject to the grievance and arbitration provisions . . .". The result of these illegal strike activities, alleges BCOA, has been the "closing of coal mines and the interruption of the production of coal vital to the Nation's energy needs". The complaint estimates that in 1975, up to September 16, 1975, the date of filing the complaint, plaintiff's members lost production of 1,368,000 man-days, which translates approximately into $76,000,000 payroll loss, 16,500,000 tonnage loss, and a $22,000,000 pension and trust fund loss. The court recognizes that prior to the institution of this suit, United States District Courts in the bituminous coal fields of the Eastern United States were flooded with applications for injunctive relief against widespread work stoppages induced by roving pickets throughout the area.

BCOA therefore seeks what has been called a "prospective" injunction, directed at disputes that have not yet occurred nor yet been conceived. Specifically, BCOA prays that the court:

"(1) Issue a judgment declaring that defendant has breached the 1974 Agreement by failing and refusing to take timely, affirmative, positive and effective steps to insure compliance by its members with the 1974 Agreement and to end the national pattern and practice of illegal picketing and work stoppages by its members by any and all reasonable means at its command.

(2) Issue an order compelling defendant, its officers, agents and employees, to take prompt and affirmative action, in accordance with a plan to be submitted to and for approval by the Court within 60 days from the date of this order, explaining in specific and complete terms how it plans to take affirmative steps, and how such steps will be implemented, to insure compliance by its members with the 1974 Agreement and to end the national pattern and practice of illegal picketing and work stoppages by its members by any and all reasonable means at its command, including but not limited to (a) instructing its members that picketing and work stoppages over arbitrable issues are prohibited under the 1974 Agreement; (b) instructing its members that the refusal to cross any picket line established or maintained in violation of the 1974 Agreement is prohibited under the 1974 Agreement; (c) instructing its members of the meaning and application of the 1974 Agreement; (d) disciplining all members, including officers and committeemen of subordinate administrative divisions, who fail or refuse to comply with the 1974 Agreement, or who instigate, condone and ratify illegal picketing or work stoppages; (e) refusing to defend Districts or local unions or individuals who engage in, condone, or instigate ille-

and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Disputes' Article of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as

heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts.

gal strike activity; (f) condemning so-called "roving" and "stranger" picketing, identifying such pickets and disciplining them; and (g) suspending the autonomy of any District or local union which instigates, aides, or condones, ratifies or sanctions any such illegal picketing or work stoppage, or otherwise fails to carry out promptly and effectively defendant's instructions to cease such illegal action or to bring about the cessation of such illegal action.

(3) Grant such other relief as may be appropriate.

Defendant has moved to dismiss the complaint for numerous reasons *summarized* as follows:

1. Plaintiff's action is barred by the express terms of the 1974 Agreement.

2. Lack of jurisdiction.

    A. The injunctive relief requested is expressly prohibited by the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq.

    B. The Declaratory Judgment Act does not confer jurisdiction to grant relief prohibited by the Norris-LaGuardia Act.

3. Failure to join indispensable parties.

    A. BCOA member companies.

    B. Defendant's District and Local unions, and their officers and members.

4. The relief sought is inconsistent with Congressional policy and unlawful.

5. Plaintiff lacks authority to bring this suit and is not a real party in interest.

6. The request for injunctive relief is moot.

    A. Imposing a "best efforts" obligation on defendant, or to make it guarantor of its member's conduct, is contrary to the 1974 Agreement, its bargaining history, and federal labor policy.

    B. The policy adopted by UMWA on September 8, 1975 discharges whatever obligations defendant may have.

We will not discuss each of defendant's objections separately but will deal with the critical issues which we believe to be determinative.

Because we are considering a motion to dismiss, we will take all of plaintiff's well pleaded allegations as admitted, *Gardner v. Toilet Goods Ass'n.,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 [1967], and construe each allegation of the complaint favorably to plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 [1974]. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957].

Aside from the requirement on a motion to dismiss that we assume the truth of plaintiff's allegations, the court has little doubt, based on its own experiences with labor disputes, that plaintiff can produce substantial evidence of repeated violations of the 1974 Agreement, numerous § 301 suits, and substantial disregard of the arbitration procedures by some local unions or individual members. This District Court, perhaps as much as any other District, has dealt with numerous § 301 suits against mine workers. The widespread nature of the problem is touched on by Judge Miller's lament in *United States Steel v. United Mine Workers, etc.,* 418 F.Supp. 172 [W.D. Pa.1976][2]:

"This is indeed a sad time for many. It now appears that the days or eradicating labor strife through peaceful arbitration are close to extinction. There is in our midst a new breed of miners who are determined to fashion their own federal labor policy. Unfortunately for industry *and* labor, collective bargaining does not work when one party says 'we do it my way or we don't do it at all.' At this stage courts can no longer provide solutions to the problems posed by the cir-

---

2. This was a case in which an injunction would not lie, as the walkout was a sympathy strike protected from injunction by *Buffalo Forge Co.*

*v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 [1976].

cumstances of this case. Under the current conditions legislative action may be necessary. In any event anarchy cannot be tolerated under our form of government". (Emphasis in original). 418 F.Supp. at 175.

Defendant itself admits in its brief (p. 19) that many BCOA member companies "have with considerable frequency instituted suits in this court and elsewhere against the International Union, its various Districts and Locals as a result of wildcat strikes." While most labor disputes that come before the courts do not result in orders, published opinions or appeals but end during or after a court hearing,[3] a glance at Third Circuit cases reveals the numerous times that the Third Circuit has considered the 1974 UMWA Agreement or predecessor agreements.[4]

## I. INJUNCTIVE RELIEF.

We have no difficulty in concluding that the complaint is sufficient to allege a breach of the 1974 Agreement and in this respect states a claim under § 301 of the LMRA. The more difficult question is whether the law provides plaintiff with the relief requested.

### A. *Breach of The 1974 Agreement.*

■ As we have noted, the International has expressly agreed to "maintain the integrity" of the 1974 Agreement. The question is whether defendant, concomitant with that obligation, is required to exercise its best efforts, or at least its reasonable efforts, to terminate illegal and unauthorized work stoppages and to act diligently to prevent or reduce such violations in the future.

*Teamsters Union v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 [1962], establishes that an express arbitration clause implies an agreement not to strike.[5] *Eazor Express Inc. v. Int. Bro. of Teamsters,* 520 F.2d 951 [3d Cir. 1975], *cert. denied* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 [1976], holds that a no strike agreement implies an obligation on the part of the union to use every reasonable means to end an unauthorized walkout by its members. The obligation to "maintain the integrity" of the contract was found by Judge Gibbons in *United States Steel v. UMW,* 534 F.2d 1063, 1073 [3d Cir. 1976], to be a sufficient basis for implying a reasonable efforts obligation on the part of the union. Recently, in *Republic Steel Corp. v. UMWA,* 428 F.Supp. 637 [W.D.Pa.1977] [decided March 21, 1977], we held that this obligation extends even to sympathy strikes insofar as the International bears some obligation to the employers with which it has contracted to prevent the spread of illegal wildcat strikes originating against other employers.[6]

■ Collective bargaining agreements impose a continuing day-to-day obligation on the parties to fulfill their terms in good faith. *Curtiss-Wright Corp., Wright Aero. Division v. NLRB,* 347 F.2d 61, 68 [3d Cir.

3. It is this court's experience that a majority of the labor disputes which give rise to applications for injunctions are settled by conferences between the courts and opposing attorneys and the representatives of management and union officers prior to the taking of any testimony, which step too often exacerbates the bad feelings causing the walkout.

4. See *United States Steel v. United Mine Workers,* 548 F.2d 67 [3d Cir. 1976];
*United States Steel v. UMWA,* 534 F.2d 1063 [3d Cir. 1976];
*Jones & Laughlin Steel Corp. v. UMWA,* 519 F.2d 1155 [3d Cir. 1975];
*Island Creek Coal Co. v. UMWA,* 507 F.2d 650 [3d Cir. 1975] *cert. denied* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 [1975];

*Bethlehem Mines Corp. v. UMWA,* 494 F.2d 726 [3d Cir. 1974];
*Gateway Coal Co. v. UMWA,* 466 F.2d 1157 [3d Cir. 1972] *reversed* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 [1974].

5. However, to the extent that courts have assumed that a mandatory arbitration clause implies a commitment not to engage in sympathy strikes they are wrong. *Buffalo Forge Co.,* 428 U.S. 397, 408, 96 S.Ct. 3141, 49 L.Ed.2d 1022 [1976] (footnote 10).

6. Our holding in *Republic Steel* is not essential to the determination of the case at bar, as the strikes complained of in this case included not only sympathy strikes but *all* walkouts in breach of the 1974 Agreement.

1965]. As stated in *Eazor Express,* supra, at p. 960:

"A no-strike agreement would be illusory indeed were a union to be permitted to avoid all responsibility under it for the duration of a prolonged strike which was being carried on by the concerted action of all its members employed in the struck operation, merely because the strike was not initially authorized or called by the union as an organization or by those of its officers who were specially empowered to do so. Rather than to construe a contract as producing such a result, the courts will favor a construction making the mutual promised binding and giving the contract legal effect. 1A *Corbin on Contracts,* 8–9; 3 *Corbin on Contracts,* 168–171; 17 Am.Jur.2d 452."

We therefore conclude that the complaint alleges a breach of the 1974 Agreement.

### B. *The availability of prospective injunctive relief.*

All injunctions are prospective in the sense that they restrain certain activity in the future for the duration of the order. We are dealing here, however, with an injunction prospective in the sense that future action is proscribed in situations not yet existing and removed from the present facts.

The availability of prospective *Boys Markets* injunctions in labor cases has been considered by four circuits. In the Third Circuit, *United States Steel Corp. v. UMWA,* 534 F.2d 1063 [3d Cir. 1976], *rehearing denied* 534 F.2d 1084, gave rise to three separate opinions. Judges Gibbons and Rosenn agreed that before prospective injunctive relief can be ordered, the district judge must find from the evidence that violations that have occurred are likely to recur, or that the pattern of past violations indicates that different violations will occur. The prospective part of the injunction would then be directed to prohibiting the recurrence of such potential future violations. Judge Rosenn did not, however, join Judge Gibbons' statement that the court "must 'relate the likelihood of recurrence or

occurrence to some act, omission, or responsibility of each defendant against whom such injunctive relief is ordered.' " 534 F.2d 1082, note 9. Both Judges agreed that the injunction in question did not adequately differentiate among the duties imposed on the local, district and international unions. In this regard Judge Gibbons stated, at p. 1078:

" * * * It seems to us that any prospective injunctive decree must tell the local what specific steps it must take to prevent illegal work stoppages from recurring and must tell the parent organization what prophylactic steps it must take to assure that the local fulfills its contractual obligation. A blanket injunction in the language of the arbitration clause places in the hands of the successful § 301 plaintiff a weapon by which harassment by contempt citations may take the place of normal ongoing collective bargaining process. No § 301 defendant should be subjected to that risk."

Chief Judge Seitz expressly declined comment as to whether Section 9 of the Norris-LaGuardia Act precludes a federal court from enjoining a pattern of conduct resulting in repeated and similar contractual violations. Rather, he held that since the district court order was at the preliminary injunction stage, future, prospective work stoppages were not properly at issue.

We note as particularly relevant to this case the language of Judge Gibbons in *United States Steel,* with which Judge Rosenn does not appear to disagree:

" * * * If the plaintiff in a § 301 suit pleads and proves that the defendant, whether labor organization or employer, is engaging in a pattern of conduct which results in repeated and similar violations, nothing in § 9 of the Norris-LaGuardia Act, as we read it, prevents an injunction directed at such a course of conduct. The court that has once determined in an adversary proceeding the meaning of a contract must have the power to protect the parties and itself from the necessity for and burden of repeatedly adjudicating what often may be the identical issue.

And while we agree with Judge Wisdom that the *Lincoln Mills-Boys Markets* exception to the Norris-LaGuardia Act requires ad hoc adjudication relating the violation to the contract, we do not agree that a remedial injunction may not encompass a pattern of ongoing activity. It is by no means clear that Judge Wisdom intended to suggest that injunctive relief is entirely unavailable against a chronic pattern of continuing mischief. If he did, however, we respectfully disagree." 534 F.2d at 1077.

The cases from the Fifth, Seventh and Tenth Circuits involving prospective injunctions are thoroughly discussed in Judge Gibbons' opinion in *United States Steel,* and we can do no better that to quote his opinion at length, pp. 1075–6:

"The issue of prospective *Boys Markets* injunctive relief to remedy repeated breaches of the collective bargaining agreement is in this circuit one of first impression. Recently the Fifth Circuit overturned a decree framed as broadly as the arbitration clause. *United States Steel Corp. v. United Mine Workers of America,* 519 F.2d 1236 [5th Cir. 1975], *petition for cert. filed,* 44 U.S.L.W. 3626 [U.S. Apr. 26, 1976] [No. 95–1562]. The court wrote that an injunction so framed went beyond what *Boys Markets* permitted, violated § 9 of the Norris-LaGuardia Act, and did not comply with Fed.R. Civ.P. Rule 65. *Id.* at 1245. The precise holding may be narrower, however, since the court also observed that the 'memorial protest' which produced the work stoppage was not over a matter which could under the agreement be grieved and arbitrated. *Id.* at 1248. Moreover, the Fifth Circuit has in other contexts taken a more restrictive view of the availability of *Boys Markets* relief than has this court. [citations omitted]. Nevertheless, Judge Wisdom's thorough analysis of the reasons why, assuming any injunction was appropriate, a prospective injunction drawn as broadly as the contract was improper, cannot be lightly regarded. He reasoned that the *Lincoln Mills-Boys Markets* exception to the Norris-LaGuar-

dia Act's prohibition against federal injunctions in labor cases necessarily required an ad hoc adjudication whether the underlying dispute could be grieved and arbitrated under the contract. A prospective injunction in the language of the contract precluded such case-by-case analysis, except, perhaps, in contempt proceedings. Thus, the injunction was necessarily broader, in proscribing activity, than *Boys Markets* permitted.

Judge Wisdom also pointed to the language in § 9 of the Norris-LaGuardia Act, which requires that

'every . . . injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case. . . .' 29 U.S.C. § 109.

\* \* \* \* \* \*

"It can hardly be gainsaid that in spirit if not literally § 9 proscribes a prospective injunction against breaches of contract that may not yet even be contemplated or that are unlikely to occur.

Finally, Judge Wisdom referred to the requirement in Rule 65(d), Fed.R.Civ.P., that every injunction be specific in terms and describe in reasonable detail the act or acts sought to be enjoined. That rule requires that the order give fair warning of what conduct will be contemptuous. A cross reference to the arbitration clause . . . hardly seems the kind of notice contemplated by the rule.

In cases dealing with the same collective bargaining agreement examined by Judge Wisdom in the *United States Steel* case, the Seventh Circuit in *Old Ben Coal Corp. v. Local 1487, U.M.W.,* 500 F.2d 950 [7th Cir. 1974] [*Old Ben II*] and the Tenth Circuit in *CF&I Steel Corp. v. United Mine Workers of America,* 507 F.2d 170, 173–77 [10th Cir. 1974], have sustained prospective injunctions similar to the one entered in this case. In both cases the district court found that repeated breaches of contract had occurred and were likely to recur.

The Seventh Circuit had earlier warned the defendant Local 1487 that its unwillingness to accept the court's adjudication that it could not strike over arbitrable grievances might result in a broad prospective injunction.

\* \* \* \* \* \*

The Tenth Circuit in the *CF&I* case relied heavily on *NLRB v. Express Publishing Co.,* 312 U.S. 426, 436–37, 61 S.Ct. 693, 701, 85 L.Ed. 930, 937 [1941], in which the Supreme Court approved some injunctive relief calculated to prevent future violations of the law. But that case lends no support for a § 301 injunction, for it involves a suit by a governmental agency to enforce a statutory policy, in which injunctive relief is expressly authorized by statute. In contrast, a *Boys Markets* suit is a private contract action which is a narrow exception to a statutory prohibition against injunctive relief. *See generally United States Steel Corp. v. United Mine Workers of America,* supra, 519 F.2d at 1247 n. 21. The *CF&I* opinion, unlike *Old Ben II,* did address the applicability of § 9. Acknowledging that *Boys Markets* requires an accommodation with the Norris-LaGuardia Act, it finds one by holding that § 9 permits a prospective injunction where the complaint gives fair warning the past violations will be relied upon as a basis for an injunction against future violations. 507 F.2d at 176. With respect to the Rule 65(d) problem the *CF&I* court points out that the injunction was not merely couched in the language of the contract, as in *Old Ben II,* but was directed against strikes or picketing over disputes arising from employee suspensions, discharges, and work assignments, all of which specific types of disputes had in the past resulted in violations."

Despite the holding of the Third Circuit *United States Steel* case that some prospective relief is available in proper cases, the relief prayed for in the instant case would go far beyond the holding in *United States Steel.* While Judge Gibbons characterized the injunction in *United States Steel* as a "general prohibition against a strike over any dispute falling within the Settlement of Disputes provisions of the 1974 Agreement", *United States Steel,* unlike the present case, dealt with one specific employer. The seven disputes in twelve months that prompted the district judge to issue the broad injunction all occurred at the "Maple Creek complex". The *United States Steel* injunction may be read as prohibiting work stoppages only at those mining works, and even if it is read to include *all* disputes between the unions and United States Steel, the injunction is nevertheless considerably narrower in scope than what is sought here. The relief sought here involves numerous companies with various degrees of involvement in this district, and with various histories of labor disputes, some of which will now prove to be non-enjoinable under *Buffalo Forge Co. v. United Steel Workers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 [1976] or for other reasons. We find *Old Ben II* and *CF&I Steel* to be similarly distinguishable, and the logic of Judge Wisdom's opinion to be most pertinent.

The Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, passed in 1932, places strict limitations on the authority of the federal judiciary to issue injunctions in labor disputes. Specifically, § 4 of the Act, 29 U.S.C. § 104, provides:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . from doing, whether singly or in concert any of the following acts:

(a) Ceasing or refusing to perform any work . . . .".

In 1947, Congress passed the Labor Management Relations Act, 29 U.S.C. §§ 141–187, which in Section 301, 29 U.S.C. § 185, grants the federal courts jurisdiction in suits arising out of collective bargaining agreements.

*Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d

199 [1970], is an accommodation of those two statutes. *Boys Markets* overruled the determination eight years earlier in *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 [1962] that federal courts were precluded by § 4 of the Norris-LaGuardia Act from enjoining a strike in breach of a collective bargaining agreement. In overruling *Sinclair, Boys Markets* specifically described its holding as a "narrow one":

"Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance. The dissenting opinion in *Sinclair* suggested the following principles for the guidance of the district courts in determining whether to grant injunctive relief—principles that we now adopt:

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or cause irreparable injury to the employer; and whether the employer will suffer more

from the denial of an injunction than will the union from its issuance.'" (Emphasis in original) 398 U.S. 253–4, 90 S.Ct. 1594.

Recently, in *Buffalo Forge Co. v. United Steel Workers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 [1976], the Supreme Court had occasion to re-emphasize the narrow scope of the *Boys Markets* exception. *Buffalo Forge* held that a federal court cannot enjoin a sympathy strike pending the arbitrator's decision as to whether the strike is forbidden under the arbitration clause. This decision was made even in the face of an express no-strike clause in the collective bargaining agreement. In *Buffalo Forge* it is said, at p. 407, 96 S.Ct. at p. 3147.

"The driving force behind *Boys Markets* was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties. Only to that extent was it held necessary to accommodate § 4 of the Norris-LaGuardia Act to § 301 of the Labor-Management Relations Act and to lift the former's ban against the issuance of injunctions in labor disputes. * * *".

We cannot see how the injunctive relief requested here can fail to violate the Norris-LaGuardia Act, as interpreted in *Boys Markets* and *Buffalo Forge.* Aside from our conclusion that an injunction is prohibited under the narrow *Boys Markets* exception, our own attempt to accommodate the competing considerations leads us to conclude that an injunction is improper.

An advance determination by the Court as to the specific duties of the International Union, without regard to the many and varied factual circumstances in which a dispute might arise, would expose the International to the sanctions of contempt despite what may be a good faith belief in the legality of a particular strike or walk-out. Lawful union activity would thus be "chilled". The UMWA would be forced to choose, on penalty of contempt, whether a particular action is lawful, and again on penalty of contempt, the appropriate sanction it would impose on the errant member, local union or district union.

Assuming that this Court can, from the by-laws of the International and the decisions of courts, enumerate the powers and duties of the International Union, it nevertheless cannot weigh in advance all the circumstances of each case. Circumstances would necessarily differ, and relevant considerations would include the reasons for the walk-out, the strike-history of a particular local or member, and the attitude of management. Even if these factors were carefully set forth, the International would often have difficulty in ascertaining these factors in the heat of controversy.

From our discussion elsewhere in this opinion, it is apparent that the International's obligations may vary considerably from one situation to the next. Under *Buffalo Forge, supra,* a court may not enjoin a sympathy strike pending the arbitrator's determination of whether it violates the no-strike clause of the agreement. Similarly, safety disputes may justify a differing course of action by the International.[7] It may be that other kinds of walk-outs as a class, say politically motivated strikes, justify still different responses by the International.

Another problem posed by an injunctive order in this case, and quite a significant one, is that many BCOA member companies, whose rights would be determined by this lawsuit, have their offices and mining facilities in numerous judicial districts and circuits.[8] The availability of prospective injunctive relief is quite different from one circuit to another, as is shown in *United States Steel v. United Mine Workers of America,* 534 F.2d 1063 [3d Cir. 1976], which we discussed at length previously. Aside from the added difficulty this creates in drafting appropriate injunctive relief, it cannot be overlooked that a suit with so broad a base gives plaintiff a unique opportunity of choosing a forum of its choice. Some member companies may have *no* mining facilities or other connections with this district or circuit, and granting them relief in this court would allow them to do indirectly what they cannot do directly.

We must note too that the obligations on the part of international, district and local unions vary considerably from one circuit to another. *Compare, e.g., Eazor Express Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951 [3d Cir. 1975] *cert. denied* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 [1976] (union must use "every reasonable means to bring to an end a strike") *with United Construction Workers v. Haislip Baking Co.,* 223 F.2d 872, 877–78 [4th Cir. 1955], *cert. denied* 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (union must not adopt, encourage or prolong strike). But note, Haislip·is distinguished in *Eazor Express,* 520 F.2d at 960. Likewise, as to the availability of *Boys Markets* relief generally, *compare Amstar Corp. v. Amalgamated Meat Cutters,* 468 F.2d 1372 [5th Cir. 1972] with *Island Creek Coal Corp. v. UMWA,* 507 F.2d 650 [3d Cir.] *cert. denied* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110, and *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, Local 926,* 502 F.2d 321 [3d Cir.] [en banc], *cert. denied* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 [1974]. And as we have already noted, the Circuits differ markedly

---

7. *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 [1974], held that an alleged safety hazard in employing certain foremen accused of falsifying air flow records was an arbitrable dispute. *Gateway* held that a union seeking to justify such a strike must present "ascertainable, objective evidence" supporting its conclusion, 414 U.S. at 387, 94 S.Ct. 629. We note also that Section 502 of the LMRA, 29 U.S.C. § 143, provides that the "quitting of labor * * * in good faith because of abnormally dangerous conditions for work" shall not be deemed a strike. Also, Article III(p) of the 1974 Agreement provides a separate settlement procedure for safety disputes.

8. The 1974 Agreement, attached to the Complaint, is admitted by defendant. It shows the membership of BCOA to include numerous companies, including, for example, Pittston, Consolidation Coal, Jones & Laughlin Steel Corp., U.S. Steel Corp. and Republic Steel Corp. The complaint does not allege that these member companies all have mining facilities or offices in the Western District of Pennsylvania or the Third Circuit. Nor does the record establish in which judicial districts these companies do engage in mining.

with respect to the availability of prospective *Boys Markets* relief.

A further problem posed by this lawsuit is that the relief requested would necessarily be a substantial interference with the internal administration of the union. Section 8(a)(2) of the National Labor Relations Act, 29 U.S.C. § 158(a)(2) provides:

> "It shall be an unfair labor practice for an employer—
>
> \* \* \* \* \* \*
>
> (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . .".

In other contexts the National Labor Relations Board has held that an employer is under a "positive duty" not to interfere with the internal management of a union and may not interest itself in the provisions of the union's constitution. See *Dennison Mfg. Co.*, 168 N.L.R.B. 1012 [1967]; *Federal Mogul Corp.*, 163 N.L.R.B. 927 [1967]; and *Curtiss-Wright Corp.*, 39 N.L.R.B. 922 [1942].

We do not suggest that bringing an action in district court to restrain violations of contract would constitute an unfair labor practice. Nor do we adopt defendant's characterization of the relief requested by plaintiff, particularly since we are obliged on this motion to dismiss to resolve all doubts in favor of upholding the pleading. However, Section 8(a)(2) does evince a clear legislative intent that unions be operated free of employer dominance or interference. Some of the relief requested in this case would necessarily violate the spirit, if not the substance, of this legislative goal. This is particularly so with respect to disciplining members, refusing to defend districts and locals that instigate or condone illegal strikes, and suspending the autonomy of such districts and locals.[9] We do not hold that these remedies would never be proper, but we do find these considerations relevant

in accommodating the various federal labor policies and holding as a matter of law that the broad relief requested in this case is prohibited.

For all these reasons, we conclude that prospective injunctive relief of the kind requested here cannot be granted.

## II. DECLARATORY JUDGMENT.

▉ Both parties agree that the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, is not an independent basis for jurisdiction, but is procedural only, *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 [1937]. BCOA alleges, however, that if this court has jurisdiction under § 301 of the Labor Management Relations Act, which it appears we do, then this declaratory action to determine the rights and obligations of the parties is proper. BCOA relies on *Allied Oil Workers Union v. Ethyl Corp.*, 341 F.2d 47 [5th Cir. 1965]; *Black-Clawson Co. v. Int. Ass'n of Machinists*, 313 F.2d 179 [2d Cir. 1962]; and *Int. Bro. of Pottery and Allied Workers, Local 380, AFL–CIO v. Toalston*, 380 F.Supp. 1274 [N.D.Ohio 1974]. All of these cases support the proposition generally that suits for declaratory relief may be brought where the underlying jurisdictional base is § 301 of LMRA. None of these cases, however, supports the grant of declaratory relief in this case.

*Ethyl Corp.* was a suit to determine whether the employer had a right under the collective bargaining agreement, containing an optional arbitration clause, to draft employees for overtime work. *Black-Clawson* sought a declaration whether a particular dispute was subject to arbitration and did not seek a determination of the merits of the underlying controversy. Finally, *Toalston* held that an employer and union could sue the state civil rights commission under § 301 for a declaratory determination that the union security clause of the collective bargaining agreement was lawful.

---

9. The right of District "autonomy", or to elect their own officers, has been a subject of much litigation, and UMWA, appears to be under several court orders preventing or regulating its imposition of trusteeships over certain Districts, See, e.g., *Monborne v. UMWA*, 353 F.Supp. 255 [W.D.Pa.1972] (involving UMWA District 2).

Declaratory relief is not available for every dispute. First, there must be a "case or controversy" as those terms are used in *Aetna, supra,* 300 U.S. at 240–241, 57 S.Ct. at 464:

> "A 'controversy' in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy *admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.*" [citations omitted] [Emphasis added].

Unquestionably, this suit is a "controversy" in any lay sense of the word. Further, it strikes us as a sufficient controversy to justify injunctive relief upon proper proof, if such relief were available under *Boys Markets* and *Buffalo Forge.* Nevertheless, we are struck by the language from *Aetna* as to the limitations of a justiciable controversy.

Moreover, we are not required to give declaratory judgment in every dispute that satisfies the case and controversy requirement. In *Mechling Barge Lines v. United States,* 368 U.S. 324, 331, 82 S.Ct. 337, 342, 7 L.Ed.2d 317 [1961], the Supreme Court flatly stated that, "Declaratory judgment is a remedy committed to judicial discretion." In this case, sound discretion requires us to abstain from granting declaratory relief, for much the same reasons why injunctive relief is not permitted.

We need not repeat those reasons here. However, we observe that while declaratory judgments are useful devices for determining the scope or constitutionality of a statute, or the obligation of an insurer under a policy, here we are required to determine the rights and obligations of the defendant under factual circumstances not yet encountered. This would be done, moreover, in the face of a federal labor policy that encourages the private resolution of disputes in the manner agreed to by the parties. While the prohibition against injunctive relief is more clearly established by the express terms of Norris-LaGuardia, and there is no comparable statutory provision with respect to declaratory relief, the *Boys Markets* accommodation made between § 301 of the LMRA and § 4 of the Norris-LaGuardia would be nullified if employers could nevertheless force unions into court in actions for declaratory relief.

The determinations of the kind sought here are best made on an *ad hoc* basis. A determination as broad as the contract, and couched in the language of the contract, would not aid the parties in understanding their mutual obligations. More specific determinations of the obligations of the parties risk "re-writing" the labor agreement and taking away from arbitration matters agreed by the parties to be arbitrated. While the arbitrator's interpretation must "draw its essence" from the agreement, *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 [1960], it is, nevertheless, the arbitrator's interpretation that is bargained for. In short, declaratory relief is just as inappropriate as is injunctive relief.

## CONCLUSION

In dismissing this suit, we do not hold that prospective injunctive and declaratory relief are never appropriate in labor cases. Rather, we hold that the decree sought here is not permitted by federal labor policy, where plaintiff represents multiple employers, some of whom may have no connection with this district, where judicial Circuits differ in their application of labor law, where the relief sought to some degree necessarily interferes with the internal operations of the unions, and where certain classes of strikes, even if violative of the contract, are not enjoinable under *Buffalo Forge.*

We need not reach defendant's argument that BCOA is not a proper party plaintiff

and that its member companies must be joined as necessary and indispensable parties. This argument is troublesome in that UMWA enjoys the ease of bargaining with BCOA alone, in behalf of its members, but yet seeks not to be bound to BCOA when BCOA attempts to enforce the contract in behalf of the same members. We likewise need not reach the question of whether the district and local unions are necessary and indispensable parties.

There being no claim made for monetary damages, defendant's motion to dismiss for failure to state a claim upon which relief can be granted will be granted.

See also, 431 F.Supp. 774.