See also, 431 F.Supp. 774.

CONSOLIDATION COAL COMPANY, a
corporation et al., Plaintiffs,

v.

INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, an unincorporated association, Defendant.

Civ. A. No. 75–447.

United States District Court,
W. D. Pennsylvania.

May 6, 1977.

Harold R. Schmidt, Daniel J. Stickler, Edwin J. Strassburger, Rose, Schmidt & Dixon, Pittsburgh, Pa., Jerry A. Fullmer, Jones, Day, Cockley & Reavis, Cleveland, Ohio, Thomas B. Miller, Schrader, Miller,

Stamp & Recht, Wheeling, W. Va., for plaintiffs.

J. Craig Kuhn, Melvin P. Stein, Kuhn, Engle, Blair & Stein, Pittsburgh, Pa., for defendant.

## OPINION

WEBER, District Judge.

Plaintiffs are four coal mining companies engaged in the mining and selling of bituminous coal in Pennsylvania, West Virginia, Ohio, Virginia, Kentucky and Tennessee. All are signatories to the National Bituminous Coal Wage Agreement of 1974.

The defendant, International Union, United Mine Workers of America, is a labor organization, which represents and acts for its members employed in bituminous coal mines, including those employed at the mines of the plaintiffs. It represents the employees at these mines for collective bargaining purposes and has entered into the aforesaid collective bargaining agreement on their behalf. The International Union is divided into Districts, Subdistricts and Local Unions, which are subject to the supreme legislative, executive and judicial authority of the International Union.

This is a suit under Sec. 301 of the LMRA [29 U.S.C. § 185] to enforce the provisions of a collective bargaining agreement by specific performance and to secure damages for its breach.

The 1974 collective bargaining agreement governs the relations between the parties with respect to wages, conditions of employment, and the settlement of disputes arising out of the terms of the agreement. The settlement of disputes procedure provides for the handling of grievances through various stages up to final and binding arbitration. The 1974 collective bargaining agreement also contained a separate detailed arbitration procedure for resolving health or safety disputes of the mines.

After the effective date of the 1974 Agreement a series of disputes arose at the mines of various plaintiffs early in 1975 which led to work stoppages. These local work stoppages spread, cross-picketing appeared, and by April of 1975 there were widespread work stoppages throughout Ohio, West Virginia and Pennsylvania involving mines of the various plaintiffs in this judicial district and elsewhere.

Plaintiffs had sought injunctive relief in various United States district courts against local unions and districts, including actions in this district court, over specific disputes but during this time the work stoppages had spread.

The complaint in this action was filed April 11, 1975, while widespread work stoppages were continuing in mines of the plaintiffs located in Ohio and West Virginia, outside the jurisdiction of this court. This complaint was directed solely at the International Union, and alleged that the work stoppages were illegal, in breach of the collective bargaining agreement, and that the International Union was responsible for the concerted actions of its members and had failed to take any effective action to stop this activity of its members. The complaint sought injunctive relief against the International Union in the form of a broad general mandate requiring the International Union to exercise its powers to require its members to abide by the collective bargaining agreement.

A temporary restraining order was issued on April 14, 1975 on the basis of the verified complaint, affidavit and motion, and the matter was set down for hearing which resulted in evidentiary hearings on April 23, 24, 25, 29, 30, May 1, 5, 6 and 12, 1975. These hearings were consolidated with hearing on applications for temporary restraining orders against individual work stoppages at mines of various plaintiffs in this District, in which the local unions were named as parties.

Defendants moved for a change of venue of this action on the grounds that the courts of Ohio and West Virginia, in whose districts the work stoppages had first occurred and where some of the plaintiffs had already filed actions against local unions and District 6, as well as the International Un-

ion, were more proper and convenient forum for the trial of the issues. This was in substance a motion for transfer under 28 U.S.C. § 1404(a), not because venue was improper in this District, but for the convenience of the parties and in the interest of justice. At that time it appeared that work stoppages in mines of plaintiffs in this District were beginning, for which individual restraining orders were sought, and the court held any ruling in abeyance pending the taking of testimony.

Defendants also moved to dismiss on the grounds that indispensable parties were not named, those being District 6 and numerous local unions involved in the work stoppages in Ohio and West Virginia which were not within the jurisdiction of this court. At this time, however, work stoppages had occurred at various of plaintiffs' mines in this District which were the subject of individual actions in this court. In any event, the sole relief demanded in this action was against the International Union, and the Court deferred a ruling on this motion pending the completion of testimony.

The present motion, to which this opinion is addressed, is a motion to dismiss by defendant made at the conclusion of plaintiffs' evidence. It is based on the contention of the defendant that the claim for relief is outside the jurisdiction of this court under the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq.

Thus the instant motion to dismiss at the end of the plaintiffs' evidence does not depend on the sufficiency of the evidence as to a breach of the contract terms, or on the irreparable injury shown, but rather depends upon the want of power of the court to grant the relief prayed for in any substantial degree.

While we make no findings in this opinion on the evidence pertaining to the breach of the collective bargaining agreement, we believe that it would be sufficient to sustain findings of repeated breaches of the collective bargaining agreement by many local unions of the defendant and their members, by unauthorized work stoppages, failure to use the grievance and arbitration proce-dures, widespread cross-picketing and some instances of direct action or failure of action by officers of the defendant International Union, which could impose direct as well as vicarious liability on the defendant International Union. But regardless of these findings we can only conclude that the court has no power to grant the relief prayed for.

While the plaintiffs urged the court to fashion its own relief as required by the unique nature of the case, "exercising its inventiveness in order to effectuate the policy or intent of a particular statute or legal principle being furthered by the case in question."

As a suggestion to the court the plaintiffs submitted a proposed order which they alleged in its form or one of similar substance would be appropriate in the circumstances to protect the constitutional and legal rights of the parties:

"1. The International Union, its officers, representatives, agents, servants, members and employees are preliminarily enjoined from engaging in any strike, work stoppage and/or picketing activity at any of plaintiffs' mines, or enlarging or extending in any strike or work stoppage at plaintiffs' mines over any difference, dispute or local trouble that may arise at plaintiffs' mines between the members of the United Mine Workers of America and the plaintiffs as to the meaning or application of the provisions of the National Bituminous Coal Wage Agreement of 1974 or any difference, dispute or local trouble of any kind which may arise about matters not specifically mentioned in that agreement, or over any dispute which arises at the plaintiffs' mines involving Health or Safety;

2. That the International Union, its officers, representatives, agents, servants, members and employees are preliminarily enjoined from inducing, condoning, encouraging, supporting or ratifying any strike, work stoppage and/or picketing activity at any of plaintiffs' mines over any difference, dispute or local trouble of any kind that may arise at plaintiffs'

mines between the members of the United Mine Workers of America and the plaintiffs as to the meaning or application of the provisions of the National Bituminous Coal Wage Agreement of 1974 or any differences, disputes or local trouble of any kind which may arise about matters not specifically mentioned in that agreement, or over any dispute which arises at the plaintiffs' mines involving Health and Safety;

3. The Court takes judicial notice of the fact that a panel has been established by the International Union, United Mine Workers of America, to investigate the problem of work stoppages and strikes engaged in by its members and in that regard, the International Union and its representatives, within forty-five (45) days of this Order, shall prepare and submit to the Court and counsel for the plaintiffs a report of the findings and recommendations of said panel and any actions or programs proposed by the International Union to carry out the recommendations of that panel;

4. The record in this case indicates that an International Commission has been authorized by the International Executive Board to investigate the work stoppages and the related picketing activity which recently occurred within District 6 of the United Mine Workers of America, and in that regard, the International Union and its representatives, within forty-five (45) days of this Order, shall submit to the Court and counsel for plaintiffs the findings and recommendations of said International Commission and any action or programs proposed by the International Union to carry out the recommendations of that International Commission.

5. The International Union and its representatives shall undertake an immediate investigation to determine whether or not the making of loans or paying of strike benefits encourages or discourages work stoppages among members of the International Union, United Mine Workers of America. The findings and recommendations of said investigation are to be submitted to this Court and counsel for plaintiffs within forty-five (45) days of this Order.

6. The International Union and its representatives shall establish a program whereby (upon notification of a work stoppage at any of plaintiffs' mines) an immediate investigation will be conducted to determine the cause of the work stoppage and to identify the individuals responsible for the work stoppage. Following such investigation, a report shall be submitted to the appropriate officials of the Local Union, representing the employees of that mine, and to a designated official of management at that mine, together with a recommendation by the International Union as to what, if any disciplinary action should be taken. If the Local Union officials at the mine fail or refuse to institute the recommended disciplinary action, the International Union shall forthwith initiate appropriate proceedings against the responsible members, in accordance with the United Mine Workers' Constitution and the applicable constitutional and legal safeguards.

7. The International Union shall submit to the Court and counsel for plaintiffs, within forty-five (45) days of this Order, a proposed plan or program containing the following items:

(a) A system whereby all work stoppages at plaintiffs' mines are reported immediately to the International Union by Local Union representatives;

(b) A system whereby immediate action is undertaken by the International Union to investigate each illegal work stoppage reported to the International Union;

(c) A system whereby the International Union maintains communications with responsible individuals at the District and Local Union levels to ensure that grievances are processed expeditiously and without delay under the grievance procedure contained in the collective bargaining agreement.

(d) A system whereby all imminent danger notices issued by a Mine Health

and Safety Committee pursuant to the provisions contained in Article III of the National Bituminous Coal Wage Agreement of 1974 shall be immediately reported to safety officials of the International Union, who shall immediately proceed to the mine in question and accompanied by a representative of the employer at that mine, shall investigate the issuance of the imminent danger. If, following such investigation, the International Union representative feels that an imminent danger does in fact exist, he shall so state in writing to the employer. In the event that no imminent danger is found to exist, appropriate action will be taken by the International Union to either effectuate the removal of the Mine Health and Safety Committee at the mine or to require members of the Mine Health and Safety Committee to participate in a safety training program to be established by the International Union in conjunction with designated representatives of the plaintiffs;

(e) A program whereby all members of the International Union, United Mine Workers of America, are to receive instructions as to their rights and obligations under the National Bituminous Coal Wage Agreement of 1974, including their obligation to process grievances through the grievance procedure and not to engage in strikes or picketing activity.

8. (No No. 8 submitted)

9. Upon submission of the above specified reports, proposals and programs by the International Union, plaintiffs shall have ten (10) days thereafter to submit their comments thereon, following said time a further Order will be issued directing implementation of the program.

10. In the event there is a violation of this Order, the plaintiffs are to notify the Court immediately upon such violation and after hearing and a determination that there has been a violation of this Order, a civil penalty of not less than $10,000 per day per violation shall be imposed upon the International Union, United Mine Workers of America, payable to the Clerk of this Court for the benefit of the plaintiff affected by such contempt, provided that plaintiff can prove by competent evidence that its damages resulting from such violation is equal to or in excess of $10,000 per day.

11. The International Union and its representatives are to cease and desist from instructing its members on how and when to close down plaintiffs' mines and officials of the International Union are directed to take appropriate steps to ensure that employees of the International Union do not resume such practice.

12. The Court shall retain jurisdiction of this case to ensure that its Order is complied with in all respects."

Parallel with the present case we have been considering the case of *Bituminous Coal Operators Association, Inc. v. International Union, UMWA*, 431 F.Supp. 774 Civil Action No. 75–1168. The plaintiff in that action was an association of bituminous coal mining companies whose employees are represented by the United Mine Workers of America. BCOA is the sole and exclusive bargaining agent for its member companies and is the signatory on behalf of its members of the National Bituminous Coal Wage Agreement of 1974, the contract upon which this action is based. Its members produce 65% of all bituminous coal mined in the United States, and include the plaintiffs in this action. The Complaint in that action sought injunctive and declaratory relief only and was directed solely at the same defendant as here, the International Union, United Mine Workers of America. The action at 431 F.Supp. 774 Civil Action No. 75–1168 came before the court in a different procedural aspect, a motion to dismiss on the pleadings because the court had no power to grant the relief sought. For such purposes the movant admits the factual allegations of the Complaint, which in that case were sufficient to establish multiple and widespread breaches of the collective bargaining agreement.

Despite the fact that this present case has provided a full record in support of the

allegations of its complaint, for our purposes the result is the same. We are faced with the question of the power of this court to issue a mandatory injunction against the International Union to compel it to take certain action with regard to these breaches of the collateral bargaining agreement.

■ For the reasons set forth at length in the Opinion in *Bituminous Coal Operators Association, Inc. v. International Union, United Mine Workers of America*, 431 F.Supp. 774 Civil Action No. 75–1168, issued this date we conclude that the relief sought is beyond the power and jurisdiction of this court. The conclusions of law reached in that opinion as to the lack of power of a United States District Court to grant injunctive and declaratory relief are hereby adopted and incorporated into the present opinion as the grounds for the conclusion reached herein.

One argument raised here that is not fully treated in our Opinion in *BCOA v. UMW* deserves further comment.

The plaintiffs have argued that the Norris-LaGuardia Act does not forbid the type of injunctive relief requested here and cites the numerous cases where injunctions have been issued specifically enforcing agreements to arbitrate. Our consideration of this argument must start with the language of the Norris-LaGuardia Act. Sec. 4 [29 U.S.C. § 104] provides that:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . . from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in Section 103 of this title.

■ The catalogue is exhaustive. The narrow exception to this rule is set forth in *Boys Markets, Inc. v. Retail Clerks*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 [1970] which in turn is further limited by *Buffalo Forge Co. v. U.S.W.*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 [1976].

One other aspect of this case requires comment. At the time this action was brought the strikes in the bituminous coal fields were widespread, expanding and continuing. Although in large measure they began in Ohio and West Virginia, they had spread to mines in Pennsylvania. They apparently began, at least in large measure, over a provision in the 1974 Agreement providing for the creation of the position of the roof bolter's helper, which the Union anticipated would create a large number of new jobs, but which actually led to a reduc-

tion in jobs when the companies assigned additional duties to the roof bolters. Disputes over this issue then took the aspect of health and safety grievances.

But during the hearings on this case it developed that the International Union had appointed an International Commission in late March 1975 which went into the coal fields and met with the plaintiffs during April 1975, to solve the immediate disputes, and that later International Committees were appointed with respect to further stoppages, and that by the end of the hearings in this case the massive and widespread work stoppages had ceased.

However, the injunctive relief sought here is not addressed to the individual work stoppages, most of which were brought before the court in separate actions against the local unions involved, but is rather addressed to the broad problems of future work stoppages of any character. It is denominated a "prospective injunction". It is addressed to future work stoppages, of whatever nature, whether or not they may be subject to the *Boys Markets* exception or the *Buffalo Forge* limitation. But Sec. 9 of the Norris-LaGuardia Act [29 U.S.C. § 109] requires that any injunction in any case growing out of a labor dispute must be limited to the findings of fact in the case before it, and must be limited to a prohibition of specific acts complained of in the bill of complaint and as found by the evidence. A similar requirement is contained in Fed. R.Civ.P. 65(d).

If, as plaintiffs argue, an injunction is sought solely to compel the International Union to adopt certain practices and procedures in the furtherance of the spirit of the collective bargaining agreement, and to make effective its terms, we face the obstacle that specific performance of a contract is available only to compel a defendant to perform the specific terms of a contract.

The relief requested here would compel the defendant International Union to undertake duties not specifically imposed by the contract. In *United States Steel Co. v. UMWA*, 519 F.2d 1236 [5th Cir. 1975] the court overturned an injunction which was phrased as broadly as the terms of the contract itself. This view was endorsed by the Court of Appeals of this Circuit in *United States Steel v. UMWA*, 534 F.2d 1063, *rehearing denied* 534 F.2d 1084 [3d Cir. 1976], where the court only had before it the question of a series of strikes at a single mine involving a single union. Our problem is vastly broader, covering mines in many states, both within and without the jurisdiction of this court.

The problems of enforcement of any such decree would be insuperable. The court would either have to assume the oversight of the internal functions of the International Union or would be compelled to hear evidence related to work stoppages of many places outside the jurisdiction of this court and beyond its power of subpoena.

We, therefore, conclude that the prayer of plaintiffs for injunctive relief must be denied and the cause of action for equitable relief dismissed.