585 F.2d 586
 99 L.R.R.M. (BNA) 2612, 84 Lab.Cas. P 10,834
 BITUMINOUS COAL OPERATORS' ASSOCIATION, INC., a corporation, Appellant,
v.
INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, an
Unincorporated Association.
CONSOLIDATION COAL COMPANY, a corporation, North American
Coal Corporation, a corporation, The Valley Camp
Coal Company, a corporation, and The
Pittston Company, a
corporation, Appellants,
v.
INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, an
Unincorporated Association.
BUCKEYE COAL COMPANY, Appellant,
v.
INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA,
DISTRICT 4, United Mine Workers of America, Local
Union No. 6290, and United Mine Workers
of America.
 Nos. 77-1876, 77-1907 and 77-1992.
 United States Court of Appeals,
Third Circuit.
 Argued May 23, 1978.
Decided Sept. 18, 1978.
 
 Leonard L. Scheinholtz, Joseph F. McDonough, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Guy Farmer, Farmer, Shibley, McGuinn & Flood, Washington, D.C., for Bituminous Coal Operators' Association, Inc.
 Harold R. Schmidt, Henry McC. Ingram, Daniel L. Stickler, Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., for Consolidation Coal Co., North American Coal Corp., The Valley Camp Coal Co. and The Pittston Co. and The Buckeye Coal Co.
 Harrison, Combs, Gen. Counsel, United Mine Workers of America, Washington, D.C., Joseph A. Yablonski, Daniel B. Edelman, Yablonski, Both & Edelman, Washington, D.C., J. Craig Kuhn, Melvin P. Stein, Kuhn, Engle & Stein, Pittsburgh, Pa., for the International Union, United Mine Workers of America.
 Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 These appeals grow out of separate attempts by signatories of the National Bituminous Coal Wage Agreement of 1974 to obtain judicial enforcement of the provisions of that agreement. The complaint of the Bituminous Coal Operators Association, Inc., (BCOA) (Appeal No. 77-1876) was filed on September 16, 1975. The complaints of Consolidation Coal Company, North American Coal Corporation, The Valley Camp Coal Company, and The Pittston Company (Appeal No. 77-1907) and of The Buckeye Coal Company (Appeal No. 77-1992) were filed on December 9, 1975, and were consolidated in the district court. On May 6, 1977, the district court entered orders dismissing the BCOA complaint and dismissing the claims for equitable relief in the consolidated mine owners' cases.[1] These appeals followed.
 
 
 2
 At the request of the plaintiffs-appellants, we postponed argument on these appeals pending the negotiation of a new National Bituminous Coal Wage Agreement to replace the 1974 agreement, which expired on December 6, 1977. Thereafter the three appeals, since they present common though not identical factual and legal issues, were referred to a single panel of this court. In the BCOA appeal, we affirm the district court's dismissal of that part of the complaint seeking injunctive relief, but reverse the dismissal of that part requesting a declaratory judgment. In the mine owners' appeals, we reverse the district court's dismissal of their claims for equitable relief. Finally, we hold that the expiration of the 1974 agreement and its replacement by the 1978 agreement do not render these appeals moot.
 
 I. THE BCOA APPEAL
 A. Facts and Proceedings Below
 
 3
 In the BCOA case jurisdiction is alleged under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. The plaintiff, a nonprofit corporation of the District of Columbia, is the exclusive collective bargaining agent for employers who produce approximately 65% Of all bituminous coal mined in the United States. The defendant is the International Union of the United Mine Workers of America (the International), an unincorporated labor organization. In December, 1974, BCOA, on behalf of its members, and the International, on behalf of the members of its district and local unions, entered into a collective bargaining agreement which regulated their employment relationship until December 6, 1977. Article XXVII of that agreement obliges both parties to "maintain the integrity of the contract" and provides that "all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Disputes' Article of this Agreement." Article XXIII, the Settlement of Disputes article, provides for peaceful settlement of disputes through a multiple-step, grievance-arbitration procedure. Disputes which are "national in character" are not subject to that article and are instead reserved for resolution through collective bargaining. 1974 National Bituminous Coal Wage Agreement, Art. XXVII.
 
 
 4
 In paragraph seven of its complaint, BCOA alleges that the International, as a consequence of its contractual undertaking, "is obligated to take timely steps to insure compliance by its members with the 1974 Agreement and to end illegal picketing and work stoppages by its members, by any and all reasonable means at its command as might be needed to insure contract compliance and to prevent, stop and end such work stoppages." The complaint further alleges that, notwithstanding their contractual obligation to arbitrate their grievances, union members have engaged "in a national pattern and practice of picketing and work stoppages over disputes which are subject to the grievance and arbitration provisions" of the 1974 agreement. BCOA's Complaint, P 8. During the first half of 1975, BCOA alleges, these illegal activities produced lost production of 1,368,000 man-days, a figure which is equivalent to a $76,000,000 payroll loss, a 116,500,000 tonnage loss, and a $22,000,000 pension and trust fund loss. The complaint also details similar production losses due to similar illegal activity during prior collective bargaining agreements beginning in 1970.
 
 
 5
 BCOA asserts that "based on said national pattern and practice of illegal picketing and work stoppages, similar illegal actions . . . in the future are threatened and indeed are certain to continue to occur unless affirmative and positive steps are taken by the defendant, its officers and agents, to discourage, prevent, stop and end such illegal picketing and work stoppages." BCOA's Complaint, P 8. It further alleges that "(p)ursuant to the 1974 Agreement and defendant's Constitution and under law, defendant has ample authority and the specific means to insure compliance by its members with the 1974 Agreement and to end illegal picketing and work stoppages by its members." Id. P 9. Paragraph nine of the complaint lists seven specific means to which the International could have resorted in order to insure compliance with the 1974 agreement.[2] BCOA charges that notwithstanding its repeated demands on the International, none of these means was utilized. By declining to undertake such specific actions, BCOA insists, the International "has condoned, ratified, and encouraged such illegal strikes and illegal picketing and interference with work and thus has breached its agreement with plaintiff." BCOA's Complaint, P 10.
 
 
 6
 The complaint, which alleges irreparable injury to BCOA, its members, and the public, seeks declaratory and injunctive relief. The complaint contains no prayer for money damages.[3] BCOA seeks instead:
 
 
 7
 (1) . . . a judgment declaring that the International has breached the 1974 Agreement by failing and refusing to take timely, affirmative, positive and effective steps to insure compliance by its members with the 1974 Agreement and to end the national pattern and practice of illegal picketing and work stoppages . . . ; and
 
 
 8
 (2) . . . an order compelling the International, its officers, agents and employees, to take prompt and affirmative action in accordance with a plan to be submitted to and for approval by the Court . . . explaining . . .how it plans to take affirmative steps . . . to insure compliance by its members with the 1974 Agreement.
 
 
 9
 BCOA's Complaint, Prayer for Relief. Fairly read, the complaint seeks a declaration that the International has committed past breaches of the collective bargaining contract and an injunction compelling it to take prescribed steps to prevent such breaches in the Future.
 
 
 10
 In response to BCOA's complaint, the International filed a pleading denominated "Motion to Dismiss, Answer, and Counterclaim." This pleading admits that BCOA is the exclusive bargaining agent for the mine owners and that the International bargained on behalf of its district and local unions. It denies, however, that the latter unions are subordinate administrative divisions of the International. Instead, the pleading alleges that they are separate and autonomous labor organizations, subject only to limited control by the International. In its pleading, the International claims that BCOA could have bargained, but instead failed to bargain, for contractual undertakings which would have imposed on the International the duties respecting wildcat strikes which BCOA alleges have been breached. The International also denies that it has failed to exercise such authority that it possesses to reduce or end work stoppages and picketing by its members.[4]
 
 
 11
 The International's counterclaim is pleaded in the alternative: only if the district court fails to grant the International's motion to dismiss on jurisdictional grounds, should it consider the counterclaim. In this claim, the International alleges that BCOA had, under the 1974 agreement, certain specific continuing responsibilities which it failed to discharge and which contributed to the prevalence of the wildcat strikes. The counterclaim seeks a declaration that BCOA breached such obligations and an order directing it to submit to the court a comprehensive program for the discharge of those obligations in the future.
 
 
 12
 The district court granted the International's motion to dismiss BCOA's complaint. In granting this motion, the court first addressed the claim for injunctive relief aimed at the International's future conduct. The court concluded that the complaint sufficiently alleged a breach of the 1974 agreement and thus that it sufficiently alleged a cause of action under § 301. The court recognized that in United States Steel Corp. v. UMW, 534 F.2d 1063 (3d Cir. 1976), we held that under certain limited circumstances injunctive relief might be available to prevent future breaches of a collective bargaining contract. Nevertheless, it concluded that the injunction requested by BCOA went beyond the relief authorized by United States Steel. As an additional reason for denying the injunction, the court observed:
 
 
 13
 Another problem posed by an injunctive order in this case, and quite a significant one, is that many BCOA member companies, whose rights would be determined by this lawsuit, have their offices and mining facilities in numerous judicial districts and circuits. The availability of prospective injunctive relief is quite different from one circuit to another . . . . Aside from the added difficulty this creates in drafting appropriate injunctive relief, it cannot be overlooked that a suit with so broad a base gives plaintiff a unique opportunity of choosing a forum of its choice. Some member companies may have No mining facilities or other connections with this district or circuit, and granting them relief in this court would allow them to do indirectly what they cannot do directly.
 
 
 14
 431 F.Supp. at 784 (footnotes omitted; emphasis in the original).
 
 
 15
 The district court then turned to BCOA's prayer for declaratory relief. The court held that "for much the same reasons" as those supporting its denial of injunctive relief, sound discretion required it to abstain from issuing a declaratory judgment. The court observed that if it granted the declaratory relief, it would be "required to determine the rights and obligations of the defendant under factual circumstances not yet encountered." 431 F.Supp. at 786. Moreover, granting such relief, the court reasoned, would interfere with the federal labor policy of encouraging private resolution of disputes in the manner agreed upon by the parties.
 
 
 16
 Since BCOA's complaint had not included a prayer for money damages, the entire complaint was dismissed. This appeal followed.
 
 B. Discussion
 
 17
 Since the district court granted the defendant's motion to dismiss the complaint, we must determine whether, on any set of facts which BCOA could prove in support of its complaint, it would be entitled to either declaratory or injunctive relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although our review thus focuses on the allegations of the complaint, an indication of the nature of the dispute can be gleaned both from that complaint and from the pleading filed by the International in opposition to the complaint. As our earlier discussion demonstrated, the International's pleading and BCOA's complaint offered inconsistent interpretations of the 1974 agreement. Each party accused the other of having breached the contract. Together the two adverse pleadings set forth a clear dispute over the scope of the obligations which each party to this lawsuit undertook in the collective bargaining contract. Thus, it cannot be gainsaid that this is, as the district court concluded, a suit over which the court had subject matter jurisdiction by virtue of 29 U.S.C. § 185 and 28 U.S.C. § 1337. We turn, then, to the merits of the judgment on the pleadings.
 
 1. Injunctive Relief
 
 18
 In denying BCOA's request for injunctive relief, the district court placed great reliance upon the fact that the mining facilities of BCOA members were located in many different judicial districts and circuits. We think that such reliance was misplaced. In an action seeking an injunction to enforce a contract, a court of equity acts in personam. As long as the court has jurisdiction over the defendant, the distant situs of the subject matter is not a bar to the exercise of the chancellor's powers. Massie v. Watts, 10 U.S. (6 Cranch) 148, 158-59, 3 L.Ed. 181 (1810); Penn v. Lord Baltimore, 1 Ves. 444 (Ch. 1750). Nor is it a bar to relief that a party has chosen for an in personam action a forum which he believes will be favorably disposed toward the selected remedy.
 
 
 19
 The district court also adverted to the difficulty of drafting appropriate injunctive relief. Such difficulty might, in the end, be a reason for denying some of the requested relief. But that is not a reason for refusing to hear the case. Until the scope of the International's obligations under the contract has been determined, there is nothing against which the court can measure the difficulty of drafting or enforcing an injunction.
 
 
 20
 Although we disapprove of some of the grounds relied upon by the district court to dismiss the request for an injunction, we think the court's ruling was nevertheless correct. The court also ruled that the requested relief went beyond that permitted by this circuit's interpretation of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. We agree.
 
 
 21
 In § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, Congress granted to the district courts the authority to entertain suits to enforce labor contracts. Yet § 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, prohibits courts from issuing certain types of injunctions in labor disputes. In order to resolve the tension between these two statutory sections, the Supreme Court in Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), carved out a narrow exception to the Norris-LaGuardia Act's prohibition. The Court held that where the underlying dispute is subject to mandatory arbitration under the collective bargaining contract and where the strike is thus in violation of a no-strike clause, the Norris-LaGuardia Act does nor bar injunctive relief pending arbitration. The narrowness of this exception was reiterated in Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 406-09, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).
 
 
 22
 In United States Steel Corp. v. UMW, 534 F.2d 1063 (3d Cir. 1976), we confronted the issue of whether a Boys Markets injunction could operate to enjoin future strikes.[5] Although we vacated the particular injunction granted by the district court in that case, we held that in some instances a court could prospectively enjoin a pattern of contract violations. We wrote:
 
 
 23
 The power of a federal court to decide the meaning of a labor agreement in a § 301 suit is clear. Once it has done so it should not be required to relitigate essentially the same issue in a slightly different context over and over again.
 
 
 24
 534 F.2d at 1077. What we held in United States Steel, then, was that the district courts' authority under § 301 to issue judgments granting Boys Markets injunctions necessarily carries with it the power to make those judgments effective between the parties. But the predicate for the relief we held might be possible is a prior case establishing an enjoinable breach of contract. Only if the court has found both a violation of the contract and a likelihood of a similar violation occurring in the future can the specificity requirement of § 9 of the Norris-LaGuardia Act, 29 U.S.C. § 109,[6] be satisfied. And under Boys Markets itself, the underlying dispute must be arbitrable before the breach can be enjoined. Our opinion in United States Steel dealt only with such arbitrable disputes.
 
 
 25
 Both sides agree that the dispute over the International's contractual obligation to discipline its members is not subject to arbitration. The International claims that the dispute is national in scope and therefore excepted from the settlement of disputes article. BCOA contends that the injunction it seeks is entirely collateral to the union members' no-strike obligation, which a Boys Markets injunction would enforce and which would, absent that decision, fall squarely within §§ 4(a), (e), and (i) of the Norris-LaGuardia Act.[7] The relief it seeks, BCOA argues, is not proscribed by § 4 and thus does not involve the Boys Markets accommodation at all. BCOA must take that position, for if the relief it seeks falls within § 4 and if the underlying dispute is not arbitrable, the flat prohibition of § 4 controls.
 
 
 26
 Read literally, the prayer for relief in BCOA's complaint does not seek an injunction against a work stoppage or against peaceful picketing, thereby arguably not violating §§ 4(a) or (e). But even on its face, the requested relief might run afoul of § 4(i), which prohibits injunctions against the advising of either work stoppages or picketing. More important, although the injunction BCOA seeks is not In haec verba addressed to work stoppages or picketing, but rather to the International's alleged contractual obligations, control of work stoppages and of picketing is BCOA's ultimate objective. The anti-injunction policy adopted by Congress in §§ 4(a), (e), and (i) of the Norris-LaGuardia Act cannot be circumvented by directing injunctive relief to duties "collateral" to a no-strike obligation. We do not hold that in a § 301 suit an injunction would never be available to enforce a collateral, contractual undertaking not subject to arbitration, for conceivably some such contractual undertaking might not involve the activities protected by § 4. But we do hold that where, as here, the real objective of the injunction sought is to prevent work stoppages and picketing, § 4 applies.
 
 
 27
 Since § 4(a) applies, only an injunction within the bounds of Boys Markets and United States Steel is permissible. For two reasons, such an injunction is not available here. First, as both parties agree, the extent of the International's alleged contractual obligation to discipline its members is not subject to the arbitration provisions of the 1974 agreement. Second, even if the dispute was arbitrable, the prospective injunction sought here did not, when the district court ruled on it, fall within the relitigation exception to the Norris-LaGuardia Act announced in United States Steel. The injunction requested by BCOA would not be restricted to violations of identical contractual obligations which threaten to recur. An injunctive order phrased as broadly as that sought by BCOA would undoubtedly violate both § 9 of the Norris-LaGuardia Act and Rule 65(d) of the Federal Rules of Civil Procedure. Thus, we affirm the district court's conclusion that BCOA's complaint fails to state a claim upon which the requested injunctive relief could be granted.[8]
 
 2. Declaratory Relief
 
 28
 We reach a different conclusion, however, with respect to BCOA's request for declaratory relief. At the outset, we note some issues which are not presented by that request. This is not a case in which the parties have contracted, in a forum selection clause, to have the disputed issue of contract interpretation resolved by a designated grievance-arbitration mechanism. BCOA contends that the International undertook certain contractual obligations by signing the 1974 agreement. The International denies that it did so. Although both parties agree that wildcat strikes may violate the Settlement of Disputes article of the 1974 contract, neither party contends that this article applies to the instant dispute over the International's obligations under the contract. Thus, we are not dealing with a situation in which the rendition of a declaratory judgment would displace or anticipate the interpretation of the contract by the forum chosen contractually by the parties.[9] Nor is the court asked to render a declaratory judgment on an issue within the exclusive jurisdiction of the National Labor Relations Board.[10] Granting declaratory relief in the instant case would not circumvent the necessity for exhausting administrative remedies.[11] Nor would the court, by granting declaratory relief, transgress in any way upon the decisional responsibilities of a sovereign state.[12] In short, none of the grounds typically relied upon by courts to deny declaratory relief is applicable here.
 
 
 29
 The dispute between BCOA and the International would seem, moreover, to be the kind for which a declaratory remedy is particularly apt. The parties entered into a long-term contractual arrangement imposing mutual obligations. Each side contends that the other has defaulted in discharging those obligations. The International denies that it undertook many of the obligations which it is alleged to have breached. It contends, instead, that it has fully performed those obligations which it admits it undertook by signing the 1974 agreement. Certainly there is nothing abstract or hypothetical about this dispute. We can think of no reason why the district court could not resolve, for the remaining life of the ongoing relationship, the extent of the parties' disputed obligations. In denying BCOA's request for declaratory relief, the district court observed that "(a) determination as broad as the contract, and couched in the language of the contract, would not aid the parties in understanding their mutual obligations." 431 F.Supp. at 786. That may be true, but BCOA does not seek a declaration as broad as the contract itself. It seeks a declaration that the International's past activity, and past inactivity in the face of wildcat strikes by its members, breached the union's contractual obligation. A declaration that such breaches did or did not occur certainly would aid the parties in understanding their mutual obligations under the contract.
 
 
 30
 The International argues, however, that in any dispute within the coverage of the Norris-LaGuardia Act a declaratory judgment is prohibited to the same extent as an injunction. The cases in other jurisdictions hold to the contrary.[13] We agree with the results reached in those cases for several reasons. In the first place, in 1932, when the Norris-LaGuardia Act was enacted, a federal declaratory judgment remedy did not even exist. The Declaratory Judgments Act[14] was not passed until after the decision in Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730 (1933), where the Supreme Court, reviewing a state court's declaratory judgment, retreated from its former position that a suit for a declaratory judgment was not a case or controversy.[15] Since federal courts as of 1932 could not grant declaratory judgments, Congress undoubtedly did not even consider prohibiting such judgments in the labor context when it enacted the Norris-LaGuardia Act. The drafters of the Norris-LaGuardia Act were concerned, not with declaratory judgments, but with injunctions in diversity-jurisdiction cases and with the concomitant contempt citations, which had been wielded by federal judges thought to be hostile to the labor movement. State declaratory and injunctive remedies were left intact, as were federal diversity remedies at law. There is no indication that when Congress passed the Declaratory Judgments Act, it intended to except labor disputes from those cases in which declaratory judgments would be available. Thus, this is not a case in which the plaintiff is resorting to a declaratory judgment as a substitute for other equitable remedies which, as a matter of legislative policy, have been proscribed.[16]
 
 
 31
 The International contends, however, that if the district court should issue a declaratory judgment specifying the union's obligations in the ongoing relationship, the effect of that judgment would be identical to the effect of an injunction issued in the terms of the contract. We disagree.
 
 
 32
 Unlike an injunction, which commands immediate obedience on pain of contempt, a declaratory judgment has approximately the same sanctioning effect with respect to future conduct as does a judgment in an action at law for money damages. The Declaratory Judgments Act provides:
 
 
 33
 Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.
 
 
 34
 28 U.S.C. § 2202. The judgment preclusion effect of both a declaratory and a monetary judgment must be determined in further proceedings. Thus, the judgment preclusion effect of a declaratory judgment that the International had undertaken specified contractual obligations to end wildcat strikes would be no different than that of the identical determination we made in a recent damage action in Republic Steel Corp. v. UMW, 570 F.2d 467 (3d Cir. 1978). In Republic, where we reversed a summary judgment in favor of the International, we held that the International "has a particularly grave responsibility to employ all reasonable means to ensure that unlawful (wildcat strike) actions be halted." Id. at 479. That holding, to the extent that it establishes the International's obligation under the 1974 contract, can be relied upon not only by the Republic Steel Corporation but also by other signatories to the same contract, since the International is collaterally estopped on the issues actually litigated and determined against it.[17] For future purposes, a declaratory judgment would operate no differently.
 
 
 35
 The fundamental difference between the declaratory remedy and the damage remedy does not lie in their judgment preclusion effects. Rather, the difference is that the declaratory remedy may be resorted to before there has been a change in the status quo which results in injury, while the damage remedy presupposes the occurrence of injury and the need to compensate that injury with money. When the issue of contract interpretation has not been relegated by the parties to an arbitrable forum, we can think of no policy reasons why the declaratory judgment should be generally unavailable in labor contract litigation. Such unavailability would encourage resort to self-help, with the resultant damages, to resolve disputes over the extent of contractual obligations. That is the very result the declaratory judgment remedy was designed to avoid.[18]
 
 
 36
 The International also urges that even if a declaratory judgment might have been proper, such a remedy is discretionary and thus the district court's discretionary denial of the requested relief should be affirmed. The Declaratory Judgments Act provides that a court "May declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201. The use of the permissive "may" in § 2201 has been interpreted as a grant of discretion to the district court.[19] But what is granted is an opportunity to exercise a reasoned discretion. The district court, in determining the appropriateness of declaratory relief, must take into account: (1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies.[20] Instead of discussing these relevant considerations, the district court here misstated the scope of the relief sought and treated the request for a declaratory judgment in the same manner as if the plaintiff had requested an injunction phrased as broadly as the language of the contract. Under these circumstances, we cannot affirm the district court's dismissal at the pleading stage of the plaintiff's request for declaratory relief. The dismissal of the request for a declaration that the International had defaulted in its contractual undertakings must be reversed. The case will be remanded so that the district court can consider the above-described factors in determining whether a declaratory judgment should issue.
 
 II. THE MINE OWNERS' APPEALS
 A. Facts and Proceedings Below
 
 37
 The four mine owners appealing in No. 77-1907 are parties to the 1974 National Bituminous Coal Wage Agreement, which was negotiated on their behalf by BCOA. Their complaint names the International as the defendant. The Buckeye Coal Company, the appellant in No. 77-1992, is also a mine owner and a party to the 1974 agreement. Its complaint names as defendants both the International and some of its district and local union chapters.
 
 
 38
 In their complaints, the mine owners refer to a series of work stoppages which began in Ohio and West Virginia, and which eventually spread to Pennsylvania. The work stoppages arose out of a provision in the 1974 agreement creating the position of roof bolter's helper. Although the union members had anticipated that this new provision would create a number of new jobs, the provision in practice resulted in a reduction in the work force. Disputes over this issue took the form of grievances over health and safety issues. It is undisputed that all such disputes are subject to the grievance-arbitration procedures under the Settlement of Disputes article of the contract and that work stoppages pending the resolution of these disputes are impermissible under the contract. It is also undisputed that when work stoppages occurred at specific mine locations, numerous § 301 suits seeking Boys Markets relief were brought by the mine owners in the United States District Court for the Western District of Pennsylvania. The mine owners allege that the widespread picketing and shutdowns stemmed from efforts by the International and its members to circumvent the agreed-upon arbitration procedure and to force the mine owners to relinquish their contractual rights. All five mine owners seek both money damages and injunctive relief.
 
 
 39
 The district court held an evidentiary hearing on the mine owners' request for an injunction and, at the end of the submission of plaintiffs' evidence, granted the defendants' motion to dismiss the claim for injunctive relief.[21] In the opinion accompanying its order, the district court observed:
 
 
 40
 While we make no findings in this opinion on the evidence pertaining to the breach of the collective bargaining agreement, we believe that it would be sufficient to sustain findings of repeated breaches of the collective bargaining agreement by many local unions of the defendant and their members, by unauthorized work stoppages, failure to use the grievance and arbitration procedures, widespread cross-picketing and some instances of direct action or failure of action by officers of the defendant International Union, which could impose direct as well as vicarious liability on the defendant International Union. But regardless of these findings we can only conclude that the court has no power to grant the relief prayed for.
 
 
 41
 431 F.Supp. at 789.
 
 
 42
 The relief prayed for by the mine owners was, for all practical purposes, quite similar to that sought by BCOA in its complaint. The mine owners sought to impose on the International (and, in the Buckeye case, on the district and local unions as well) specific, mandatory duties designed to prevent the recurrence of the pattern of illegal picketing and illegal work stoppages. Referring to its simultaneous decision dismissing the BCOA complaint, the court continued:
 
 
 43
 Despite the fact that this present case has provided a full record in support of the allegations of its complaint, for our purposes the result is the same. We are faced with the question of the power of this court to issue a mandatory injunction against the International Union to compel it to take certain action with regard to these breaches of the collateral (sic) bargaining agreement.
 
 
 44
 For the reasons set forth at length in (the BCOA case) we conclude that the relief sought is beyond the power and jurisdiction of this court.
 
 
 45
 431 F.Supp. at 791-92. Thus, the district court concluded that § 4 of the Norris-LaGuardia Act barred any prospective injunctive relief and that, even if some prospective relief were proper, no decree could be framed which would comply with the specificity requirements of § 9 of that Act and Rule 65(d) of the Federal Rules of Civil Procedure.
 
 B. Discussion
 
 46
 Since the district court, in denying relief to the mine owners, relied on its BCOA opinion, our discussion of the injunctive-remedy aspects of that opinion is relevant in part here. The court's references to the location of some mines in other districts and to the difficulty of drafting appropriate injunctive relief are as misplaced in the mine owners' cases as they were in the BCOA case. In BCOA's appeal in No. 77-1876, we affirm the denial of injunctive relief on the ground that § 4 of the Norris-LaGuardia Act prohibits such relief. But we disagree with the district court's reliance on § 4 in the mine owners' cases. The work stoppages of which the mine owners complained occurred at specific mines, stemmed from underlying disputes which were arbitrable,[22] and thus fell clearly within the Boys Markets exception to § 4. Under these circumstances, § 4 is no absolute bar to an injunction.
 
 
 47
 The more difficult question, however, is the applicability of our decision in United States Steel. In that case, we predicated the availability of prospective injunctive relief upon the power of a federal court, having once adjudicated the scope of a non-strike obligation in a § 301 suit, "to protect the parties and itself from the necessity for and burden of repeatedly adjudicating what often may be the identical issue." 534 F.2d at 1077. Recognizing that the Boys Markets accommodation between § 4 and § 301 required an ad hoc adjudication of the alleged contractual violation, we held that this need was satisfied by one such adjudication and by a determination that the continuing pattern of violations involved the same factual and legal findings as those made in that adjudication. The record in the mine owners' cases establishes, we think, that the violations are mere repetitions of those previously adjudicated. Thus § 4, as interpreted in United States Steel, is no bar to prospective relief.
 
 
 48
 In that case, however, we noted that while § 4 might not bar all prospective relief, an accommodation is still required between § 301 and § 9. Just as in United States Steel Corp. v. UMW, 456 F.2d 483 (3d Cir.), Cert. denied, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972), we held that § 7 of the Norris-LaGuardia Act applies in § 301 cases, in the later United States Steel case we held that § 9 of the Act applies in such cases. Section 9 and Rule 65(d) of the Federal Rules of Civil Procedure require that the injunction be limited to the likely recurrence of violations of the same nature as those which had already been adjudicated. In addition, the injunction must specify what steps should be taken to prevent the recurrence of the violations. 534 F.2d at 1077. Writing separately in United Stated Steel, Judge Rosenn would have permitted greater latitude in fashioning a prospective injunction. 534 F.2d at 1081-82. His position did not, however, achieve majority support, and we reaffirm here the narrower approach enunciated in the opinion of the court in United States Steel.
 
 
 49
 Given the legality of some prospective relief, the question in the mine owners' cases is whether on this record the district court could have drafted a decree sufficiently specific to comply with the requirements of § 9 and Rule 65(d). If this appeal were before us on the denial of a motion for a preliminary injunction, we might be tempted to defer to the district court's discretion. But here we are reviewing a final order dismissing a complaint for injunctive relief on the ground that no relief of any kind could be ordered. We have no hesitation in holding that this dismissal was error. United States Steel requires that any prospective injunction in a § 301 case be carefully crafted, but it does not permit the court to shy away from that task in appropriate cases. Although the district court may well have been correct in rejecting some of the relief proposed by the mine owners, and although the court still must consider general equitable principles in determining the appropriateness of an injunction,[23] certainly § 9 of the Norris-LaGuardia Act does not bar an order designed to prevent the recurrence of identical walkouts at identical locations over issues similar to those previously adjudicated. The court's dismissal of the complaint for injunctive relief at the end of the plaintiffs' case was reversible error.
 
 III. MOOTNESS
 
 50
 At the time the orders appealed from were entered, the 1974 collective bargaining agreement was still in effect. However, that agreement expired by its own terms on December 6, 1977, and its expiration resulted in a long and widely publicized strike. On March 25, 1978, BCOA and the International executed the National Bituminous Coal Wage Agreement of 1978, a copy of which has been furnished to us. The International claims that due to expiration of the 1974 agreement and its replacement by the 1978 agreement, all these cases are now moot. We disagree.
 
 
 51
 We note at the outset that the expiration of the 1974 agreement and the execution of the 1978 agreement have not mooted a claim for damages by the mine owners. As to BCOA's request for declaratory relief, we think the case would be moot only if the action or inaction of which BCOA complains is entirely unlikely to recur, or if the International's obligations under the 1978 contract are so different from those under the 1974 agreement that the parties could derive no judgment preclusion benefit from an adjudication based on past conduct.[24] There has been no showing that the execution of the 1978 agreement will prevent a recurrence or continuance of the previous pattern of conduct. Moreover, our comparison of the 1974 and 1978 agreements leaves us unconvinced that the new contract has worked any fundamental change in the International's undertakings, at least respecting matters relevant here. Accordingly, we hold that BCOA's appeal from the denial of a declaratory judgment is not moot. See Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 403 n.8, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); Super Tire Eng'r Co. v. McCorkle, 416 U.S. 115, 123-26, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); Division 1287, Amalgamated Ass'n of Street Employees v. Missouri, 374 U.S. 74, 77-78, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963). Since BCOA's request for injunctive relief rests upon the same set of operative facts as does its prayer for declaratory judgment, we also hold that its appeal from the denial of an injunction is not moot.
 
 
 52
 The same reasoning applies to the mine owners' appeals. What we have been furnished is an insufficient basis for concluding that their appeals from the denial of Any prospective injunctive relief has been rendered moot. But it will be open for the district court, after considering the changes in the parties' circumstances which have occurred since its last hearing, to determine whether the previously litigated contract breaches are so likely to recur that some injunctive relief is appropriate.
 
 IV. THE INTERNATIONAL'S OTHER CONTENTIONS
 
 53
 Since none of the other defenses urged by the International was passed upon by the district court, and since most if not all of them require findings of fact, we do not consider them here. In particular, we do not pass upon the contention that in the national disputes clause of the 1974 agreement the parties intended to preclude resort to judicial remedies to resolve the present dispute.
 
 V. CONCLUSION
 
 54
 In No. 77-1876 the dismissal of BCOA's complaint seeking a declaratory judgment will be reversed, and the dismissal of the prayer for an injunction will be affirmed. In No. 77-1907 the dismissal of the complaint seeking equitable remedies will be reversed; in No. 77-1992 the dismissal of the complaint seeking a preliminary injunction will be reversed. Costs taxed in favor of appellants in each case.
 
 
 55
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting in part.
 
 
 56
 Although I concur in the majority opinion insofar as it resolves the appeals of the Bituminous Coal Operators Association, No. 77-1876 and the Consolidation Coal Company, Et al., No. 77-1907, I dissent from the majority's reversal of the denial of a preliminary injunction in the appeal by the Buckeye Coal Company, No. 77-1992. As recognized in footnote 21 of the majority opinion, the Buckeye appeal was taken from the District Court's order denying a preliminary injunction. A District Court order granting or denying a preliminary injunction will not be reversed in the absence of an abuse of discretion. See A. O. Smith Corp. v. F.T.C., 530 F.2d 515, 525 (3rd Cir. 1976).
 
 
 57
 The work stoppages, which are the immediate basis for the Buckeye as well as the other actions, have ceased. See Judge Weber's Opinion of May 6, 1977; Joint Appendix, Vol. I, p. 86. Since Buckeye's appeal involves a preliminary injunction, as opposed to the final injunctive relief involved in the Bituminous Coal Operator's Association and Consolidation Coal Company actions, I believe the District Court's denial of Buckeye's motion for a preliminary injunction should be affirmed.
 
 
 
 [1]
 Bituminous Coal Operators' Ass'n v. International Union, UMW, 431 F.Supp. 774 (W.D.Pa.1977); Consolidation Coal Co. v. International Union, UMW, 431 F.Supp. 787 (W.D.Pa.1977). The opinion appearing at 431 F.Supp. 787 does not mention the Buckeye Coal Company's complaint. However, on May 25, 1977, the district court entered an order stating:
 . . . for the reasons set forth in the Opinion and Order of May 6, 1977, in Consolidation Coal Co., et al. v. International Union, UMWA, Civil Action No. 75-447, and the Memorandum and Order of this date,
 IT IS ORDERED that plaintiffs' Motion for Preliminary Injunction is Denied, that Plaintiffs' cause of action for equitable relief is Dismissed, and that the Motion for Reconsideration is Denied.
 
 
 [2]
 The seven means listed in BCOA's complaint are:
 (a) instructing its members that picketing and work stoppages over arbitrable issues are prohibited under the 1974 Agreement;
 (b) instructing its members that the refusal to cross any picket line established or maintained in violation of the 1974 Agreement is prohibited under the 1974 Agreement;
 (c) instructing its members as to the meaning and application of provisions of the 1974 Agreement;
 (d) disciplining all members, including officers and committeemen of subordinate administrative divisions, who fail or refuse to comply with the 1974 Agreement or who instigate, condone or ratify illegal picketing or work stoppages;
 (e) refusing to defend Districts or local unions or individuals who engage in, condone or instigate illegal strike activity;
 (f) condemning so-called "roving" and "stranger" picketing, identifying such pickets and disciplining them;
 (g) suspending the autonomy of any District or local union which instigates, aids, condones, ratifies, or sanctions any such illegal picketing or work stoppages or otherwise fails to carry out promptly and effectively defendant's instructions to cease such illegal actions or to bring about the cessation of such illegal actions.
 
 
 [3]
 Although BCOA's third prayer for relief sought "such other relief as may be appropriate," the complaint contains no allegations which would sustain the recovery of money damages by BCOA
 
 
 [4]
 The International also asserts: (1) that the relief requested by BCOA is prohibited by the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq.; (2) that the coal producers represented by BCOA and the district and local unions are indispensable parties; (3) that BCOA lacks standing to bring this action because the member companies are the real parties in interest; (4) that the declaratory and injunctive relief sought by BCOA would constitute intimidation, restraint, coercion, or domination by management in violation of §§ 8(a)(1) and 8(a)(2) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (2); and (5) that paragraph 127 of the collective bargaining agreement expressly prohibits resort to the courts to resolve a dispute that is national in character
 
 
 [5]
 See generally Note, Prospective Boys Markets Injunctions, 90 Harv.L.Rev. 790 (1977)
 
 
 [6]
 § 9 of the Norris-LaGuardia Act reads in relevant part:
 (E)very . . . injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case . . .
 
 
 [7]
 According to these subsections, no injunction should issue to prevent a person from:
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment;
 (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
 (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.
 29 U.S.C. §§ 104(a), (e), and (i).
 
 
 [8]
 Whether the relitigation exception of United States Steel could be extended to permit injunctive relief to prevent relitigation of the issues determined in Republic Steel Corp. v. UMW, 570 F.2d 467 (3d Cir. 1978), is an issue not presented in this record and on which we express no view
 
 
 [9]
 See Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk, 585 F.2d 39 (3d Cir. 1978)
 
 
 [10]
 See West Point-Pepperell, Inc. v. Textile Workers Union, 559 F.2d 304 (5th Cir. 1977) (NLRB has exclusive jurisdiction to determine consequences of union successorship)
 
 
 [11]
 See Macauley v. Waterman S.S. Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 (1946); Order of Railway Conductors v. Pennsylvania R.R., 323 U.S. 166, 65 S.Ct. 222, 89 L.Ed. 154 (1944)
 
 
 [12]
 See Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)
 
 
 [13]
 E. g., Allied Oil Workers Union v. Ethyl Corp., 341 F.2d 47, 49 (5th Cir. 1965); Black-Clawson Co. v. International Ass'n of Machinists Lodge 355, 313 F.2d 179, 181 (2d Cir. 1962); International Bhd. of Pottery Workers Local 380 v. Toalston, 380 F.Supp. 1274, 1276 (N.D.Ohio 1974)
 
 
 [14]
 Act of June 14, 1934, Pub.L.No.73-343, ch. 512, § 274d, 48 Stat. 955 (originally codified at 28 U.S.C. § 400, revised and recodified in 1948 at 28 U.S.C. §§ 2201 and 2202)
 
 
 [15]
 Compare Nashville, C. & St. L. Ry. v. Wallace, supra, with Willing v. Chicago Auditorium Ass'n, 277 U.S. 274, 289, 48 S.Ct. 507, 72 L.Ed. 880 (1928)
 
 
 [16]
 Compare Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 300-01, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943)
 
 
 [17]
 See Blonder-Tongue Laboratories, Inc. v. University Foundation, 402 U.S. 313, 324, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Cramer v. General Tel. & Elec. Corp., 582 F.2d 259 at 268 (3d Cir. 1978); Bruszewski v. United States, 181 F.2d 419, 421 (3d Cir.), Cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950)
 
 
 [18]
 See E. Borchard, Declaratory Judgments, ch. IV, pp. 277-89 (2d ed. 1941)
 
 
 [19]
 A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961)
 
 
 [20]
 See Note, Developments in the Law: Declaratory Judgments, 1941-1949, 62 Harv.L.Rev. 787, 805-17 (1949). See generally E. Borchard, Declaratory Judgments, ch. V, pp. 293-314 (2d ed. 1941); Note, Declaratory Judgment and Matured Causes of Action, 53 Colum.L.Rev. 1130 (1953)
 
 
 [21]
 The mine owners' claim for money damages, on which the district court might look to Republic Steel Corp. v. UMW, supra, for enlightenment, remains undisposed of in the district court
 Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the district court directed that a final judgment be entered on the claim for injunctive relief in No. 77-1907. Thus, we have appellate jurisdiction both under 28 U.S.C. § 1291 and, because an injunction was denied, under 28 U.S.C. § 1292(a).
 In No. 77-1992 The Buckeye Coal Company appeals from the denial of a preliminary injunction. In this appeal our jurisdiction is derived from 28 U.S.C. § 1292(a).
 
 
 [22]
 Compare Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 407-08, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976)
 
 
 [23]
 See Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)
 
 
 [24]
 It should be noted that the BCOA complaint relies on conduct taking place even under the predecessor to the 1974 agreement